ROY SHELTON LLOYD, WILLIAM C. RAY, FRANK MILLER, FRANK PERRY, ERIC A. NEVILLE, EARNEST RIGSBEE, BRUCE RIGSBEE, CHARLES W. JOHNSTON, BEN GRANTHAM, AND SIMPSON L. EFLAND v. R. KENNETH BABB, MRS. W. E. HIGHSMITH, SIDNEY BARNWELL, MRS. CHARLES L. HERRING, JOHN L. STICKLEY, SR., EACH IN THEIR OFFICIAL CAPACITY AS A MEMBER OF THE NORTH CAROLINA STATE BOARD OF ELECTIONS; JOSEPH L. NASSIF, EVELYN LLOYD, LILLIAN LEE, EACH IN THEIR OFFICIAL CAPACITY AS A MEMBER OF THE ORANGE COUNTY BOARD OF ELECTIONS; FLORENCE RICHTER, GLADYS M. HARRISON, LOUISE T. CREDLE, FRANCES T. PENDERGRASS, ALICE R. BENNETT, JACQUELINE CHAMBLEE, PEGGY W. TERRY, MILDRED H. WALKER, JOSEPHINE H. BARBOUR, MARIE K. McCULLOUGH, BETTY AGNES VANHOOKE, SARA A. CATO, DAZZIE LANE, ALBERTA NEELY, BARBARA P. PROCTOR, WILLIAM E. PARKER, ROBERT D. WILSON, WILLIAM K. BROOKS, ALMA G. McCHESNEY, LORETTA H. GREENE, EDWARD F. RODMAN, EVELYN M. HARRIS, RUTH T. ANDREWS, ADDIE L. PIERCE, VIRGINIA E. JULIAN, ELEANOR C. CARTER, BARBARA A. FINCKE, ILSE R. SONNER, FRANCES O. WELLMAN, JOAN F. LONG, SHELLEY HAUSLER, BETTY BENBOW SANDERS, JAYNE H. GEBUHR, CAROLYN M. FITZ-SIMONS, DELORES E. MOE, VERA SUE TERRELL, CAROLINE M. RILEY, MARY ALLISON McADOO, JENNIFER M. WINGARD, NANCY W. LASZLO, BARBARA M. SEAGO, JOAN T. HISKEY, JEANNE HARPER, JAN BOEKE, GEORGE WESLEY HARRIS, MARGARET P. PARKER, LYNN W. BECHARD, HELEN JANE WETTACH, SARAH CHAMBERLIN, JUSTEEN B. TARBET, KATHERINE D. SAVAGE, ALICE W. HOLLIS, MARY S. RECKFORD, MARIE C. BRADFORD, EMMA G. CLARKE, JOSEPHINE T. HOLMAN, MARGARET E. RICHARDS, WILLIAM H. McCORMICK, POLLY V. COMPTON, WILLIAM MELVIN WARD, KATIE B. BYRD, JEAN L. McDADE, CUMILLA WHITE, DWIGHT OAKLEY, LOUISE H. HEATH, MARGARET M. SHANKLIN, RUTH A. McBANE, SUSAN TRABKA, SUPHRONIA M. CHEEK, JANE G. POPE, JANICE FOWLER, H. M. LLOYD, JR., CATHERINE M. WOMBLE, CAROLINE N. CARTWRIGHT, REBA D. LANE, GAYLE RANCER, SHIRLEY J. MARTIN, RUTH LONG, LINDA E. ROSE, MARGARET K. COHAN, LAVERNE ANDERSON, LOUISE W. SPARROW, JOHN MICHAEL CROWELL, CHARLOTTE GARTH ADAMS, DOUGLAS THOMAS JOHNSON, HENRY S. WHITE, FRANK S. KESSLER, LAURIE S. RADFORD, BEULAH HACKNEY, AUBREY HARWARD, LUNA CRAWFORD, BARBARA BOOTH, PATRICIA A. WALL, MARGARET LLOYD, ALPHA F. PERRY, VIRGINIA S. PERRY, JEAN CRAWFORD, PAULINE WHITFIELD, BETSY KENNINGTON, CAROLYN W. GRIFFIN, LYNDA R. JENSEN, REGINE H. HAYES, JACQUELINE CREECH, BOBBIE STRICKLAND, CAROLYN BRAXTON, TERRIE JAMES, DAVE ROBERTS, MARION LANFORD HARKINS, VERGIE ARRINGTON, HELEN ALBERT, FRANCINE CLARK, KATHRYN DANIEL, BARBARA DAVIS, LUEDDIE MERRITT, KAYE CHEETE, EDNA DAWKINS, LOUISE

Lloyd v. Babb

HAMLIN, EACH IN THEIR OFFICIAL CAPACITY AS ELECTION OFFICIALS OF THE ORANGE COUNTY BOARD OF ELECTIONS

No. 33

(Filed 5 February 1979)

1. Administrative Law § 5— meaning of "contested case"

There are two elements of a "contested case" as used in G.S. 150A-43: (1) an agency proceeding, (2) that determines the rights of a party or parties. G.S. 150A-2(2).

2. Administrative Law § 5; Elections § 2.3— alleged voter registration irregularities—decision by State Board not to investigate further—no contested case—no appeal—action in superior court

A decision by the State Board of Elections not to go forward with further investigation of alleged voter registration irregularities in Orange County, made after the Board conducted an informal public meeting to investigate charges of such irregularities, did not constitute a final agency decision in a "contested case." Therefore, plaintiffs' failure to appeal from the decision of the State Board did not require dismissal of their action instituted in the superior court for an injunction and writ of mandamus against the Orange County Board of Elections.

3. Elections § 2.1; Injunctions § 2— voter registration of students—alleged continuing irregularities—purging of voter registrants—challenge procedure as adequate remedy

The challenge procedure of Art. 8 of G.S. Ch. 163 did not provide an effective administrative remedy insofar as plaintiffs alleged continuing improprieties in the practices of the Orange County Board of Elections in registering students of the University of North Carolina who are not actually domiciled in Orange County. However, the challenge procedure did provide an effective administrative remedy for removing from the voting rolls those who had been improperly registered, even though plaintiffs alleged that between 6,000 and 10,000 voters had been improperly registered, that challenges may not be fairly heard by the Orange County Board, and that there is no appeal from such determinations by the Board, since domicile is necessarily a matter that must be heard on an individual basis, and judicial review of decisions in challenge hearings would be available in that mandamus would lie to correct any "clear abuse of discretion" in the Orange County Board's rulings. Therefore, plaintiffs' complaint stated a claim for relief for a mandatory injunction against the Orange County Board to prohibit continuing improprieties but failed to state a claim for relief for judicial purging of voter registrants.

4. Injunctions § 3— preliminary mandatory injunction—when issued

In order for a preliminary mandatory injunction to be issued, there must generally be "a clear showing of substantial injury to the plaintiff, pending the final hearing, if the existing status is allowed to continue to such a hearing."

Lloyd v. Babb

**5. Elections § 2.1— voter registration of college students—proof of domicile—preliminary mandatory injunction against board of elections—insufficient evidence to support findings**

The evidence in the record was insufficient to support a finding by the trial court that the Orange County Board of Elections has not required students who apply for voter registration to prove their domicile, and the findings were therefore insufficient to support the court's issuance of a preliminary mandatory injunction requiring the Orange County Board of Elections to presume that a student has the same domicile as his parents, to require the student to rebut such presumption, and to ask the student a list of specified questions in making a determination of domicile.

**6. Elections § 2— qualifications of voters—state regulations—basic propositions**

In determining the validity of state regulations on access to the franchise, the following basic propositions apply: (1) any state law which tends to affect the right to vote by way of making classifications must be scrutinized for conformity with the Equal Protection Clause; (2) state laws which have the effect of denying certain classes the right to vote must have a compelling justification; (3) appropriately defined and uniformly applied bona fide residence requirements are permissible; and (4) otherwise eligible persons who reside in a community and are subject to its laws must be permitted to vote there even though their interests may differ from the majority of the community's residents.

**7. Elections § 2.1— voter registration of students—domicile—inquiries of students not asked of others—constitutionality**

Determination of domicile of a student for voting purposes from various kinds of direct and circumstantial evidence, including inquiries into the student's bank accounts, ownership and location of property, vacation plans and the like, does not constitute an unjustifiable intrusion into the private affairs of students seeking to register to vote and does not amount to an attempt to make unconstitutional classifications on the basis of wealth, travel and property ownership. Nor is it impermissible to make such inquiries of students when they are not routinely made of other would-be registrants since this additional screening procedure is not an attempt to "fence out" a segment of the community because of the way it may vote but is an attempt to determine who are the members of the relevant community.

**8. Elections § 2.1— voter registration of college students—presumption that domicile is not in college town**

The use of a rebuttable presumption that a student who leaves his parents' home to go to college is not domiciled in the place where the college is located, thereby placing the burden of going forward with some proof of residence on a student seeking to register to vote, does not violate the Equal Protection Clause of the U. S. Constitution.

**9. Elections § 2.1— registration of college students as voters—intent to remain in college town only until graduation**

A student who intends to remain in his college community only until graduation should not for that reason alone be denied the right to vote in that

Lloyd v. Babb

community. Insofar as *Hall v. Board of Elections*, 280 N.C. 600, may be inter-preted to the contrary, it is modified accordingly.

**10. Elections § 2.1— voter registration of college students—domicile**

A student is entitled to register to vote at the place where he is attending school if he can show by his declarations and by objective facts that he (1) has abandoned his prior home, (2) has a present intention of making the place where he is attending school his home and (3) intends to remain in the college town at least as long as he is a student there and until he acquires a new domicile.

**11. Elections § 2.1; Injunctions § 11— county board of elections—failure to require students to prove domicile—injunction—requiring use of specific questions**

If evidence adduced at trial shows that the members and officials of the Orange County Board of Elections have failed to require students seeking to register to vote to prove their domicile to be in Orange County, the court may enjoin them from further registering students without doing so, and although the court also has the power to order the Board to use a specific set of ques-tions in connection with registering students to vote, the court should use cau-tion in the exercise of this power.

Justices BRITT and BROCK did not participate in the consideration or deci-sion of this case.

APPEAL by defendants from an order by *Bailey, J.,* as Resi-dent Superior Court Judge of WAKE County, granting a preliminary injunction. On 17 April 1978, pursuant to G.S. 7A-31, we ordered the case certified to this Court for review prior to a determination by the Court of Appeals.

*Josey & McCoy, by C. Kitchin Josey and Robert A. Hanudel; Graham and Cheshire, by Lucius M. Cheshire, Attorneys for plaintiff appellees.*

*Coleman, Bernholz & Dickerson, by Alonzo B. Coleman, Jr., and Geoffrey E. Gledhill, Attorneys for defendant appellants.*

*Chambers, Stein, Ferguson & Becton, by Adam Stein, At-torneys for defendant appellant Kessler and applicant in-tervenors.*

EXUM, Justice.

This is an action by registered voters in Orange County for an injunction, temporary and permanent, and a writ of mandamus against the Orange County Board of Elections (hereinafter Orange County Board) and its election officials. Plaintiffs allege, in essence, that defendants have systematically violated and are con-

---

Lloyd v. Babb

---

tinuing to violate the state's election laws by registering as voters students at the University of North Carolina at Chapel Hill (hereinafter the University) who are not actually residents of Orange County. Defendants' appeal from an order, after hearing, granting a preliminary injunction raises these questions: (1) Whether the trial court lacked original jurisdiction inasmuch as plaintiffs are using this procedure as a substitute for what should have been an appeal from an earlier administrative decision of the State Board of Elections (hereinafter State Board). (2) Whether the complaint should have been dismissed for failure to state a claim on the ground that plaintiffs have effective legal and administrative remedies which they have not exhausted or alleged that they have exhausted. (3) Whether the trial court's findings of fact upon which the preliminary injunction was granted are sufficiently supported by the evidence. (4) Whether and to what extent we should continue to adhere to this Court's decision in *Hall v. Board of Elections*, 280 N.C. 600, 187 S.E. 2d 52 (1972). We conclude: The trial court did have original jurisdiction to proceed. The complaint states a claim upon which relief can be granted. There is not sufficient evidence in the record to support the preliminary injunction and it is hereby dissolved. Insofar as *Hall* generally sets out procedures to follow in registering student voters, we continue to adhere to it. We hold, however, that *Hall* should not be interpreted to give dispositive weight to the fact that as a student one intends to remain in the locality of his school only until graduation in determining his entitlement to vote in that locality.

This case arises out of a dispute of several years' duration as to who should properly be included on the voting rolls of Orange County. Plaintiffs, registered voters there, are members of the Orange Committee, an organization that has been particularly active in this dispute. An attempt to resolve this dispute administratively was begun in late 1976 or early 1977 with the submission of petitions to the State Board. At least seven of the ten plaintiffs in this action joined in these petitions, which expressed concern that there were large numbers of non-residents voting in Orange County and asked the State Board for relief.[1]

---

1. Specifically they requested of the State Board:

"1. That all students from outside Orange County be purged from the registration books, or in the alternative that a completely new registration be held for Orange County.

Responding to these petitions and, apparently, to requests through other channels, the State Board met on 30 March 1977. The purpose of this meeting, called upon the written application of two members of the State Board pursuant to G.S. 163-20(a), was to determine "[w]hether or not the elections officials in Orange County have complied with statutory provisions and guidelines issued by the State Board of Elections relative to the registration of voters in Orange County." In the course of this meeting, the State Board heard "remarks" from twelve persons. The substance of these remarks is not contained in the State Board's minutes. After deliberation, the State Board adopted the following motion:

> "The State Board of Elections, acting on general authority contained in G.S. 163-20, having met in Raleigh on March 30, 1977 to make inquiry into the registration procedures administered in Orange County, and having permitted interested parties to impart pertinent information to the Board, the State Board of Elections, after consideration of all the allegations contained in the documents submitted by the Petitioners and after consideration of all information provided by the Orange County Board of Elections, this Board concludes that no further proceedings on this matter are deemed appropriate."

No further action was taken before the State Board or in respect to its disposition.

On 16 February 1978 plaintiffs filed complaint in this case in Wake Superior Court. They joined as defendants members of the State Board[2] and members and officials of the Orange County Board. In alternative claims for relief, they allege (1) a failure of election officials to perform their statutory duties by failing to determine whether persons were residents of Orange County before allowing them to register to vote there, and (2) abuse by these officials of whatever discretion the election statutes permit by their failure even to inquire whether persons were residents

---

"2. That a new primary and election be held for the two seats on the Orange County Board of Commissioners that were filled in the November 6, 1976 election.

"3. That the State Board of Elections request the Superior Court to exercise its inherent power by appointing a special prosecutor to inquire into the question of whether or not the State election laws have been wilfully and deliberately violated in Orange County."

2. The action was dismissed as to these defendants on 7 March 1978.

Lloyd v. Babb

of Orange County before allowing them to register to vote there. Plaintiffs ask for relief in various forms including both temporary and permanent injunctive relief and writs of mandamus. In essence they seek by this lawsuit three things: (1) purging of the voting rolls of Orange County and re-registration of all voters; (2) an order requiring that all registrars make full inquiry concerning the residence of any student seeking to register; and (3) an order requiring that certain specific questions be asked of each student seeking to register.

On 16 February 1978 Judge Bailey ordered defendants to appear and show cause why temporary injunctive relief should not be granted. At the hearing on 6 March 1978 he denied a motion to intervene by Steven J. Rose, Paul Howard Melbostad, Jonathan Drew Sasser, Gerald A. Cohen, James Michael Lane, Braxton Foushee, Ralph V. Aubrey, Jr., and Douglas Muir Sharer—all either students registered to vote or holders of or candidates for public office in Orange County. He also denied defendants' motions to dismiss for lack of original jurisdiction and for failure of plaintiffs to state a claim upon which relief could be granted.

On 7 March 1978 Judge Bailey, after hearing evidence, granted preliminary relief to plaintiffs. He found, among other things, that large numbers of students were registered to vote in Orange County who were not bona fide residents of the county and that the Orange County Board had failed to require students to carry the burden of proving they were bona fide residents of Orange County when they applied to register. On the basis of these and other findings Judge Bailey (1) ordered the Orange County Board to purge from voter registrations all persons who were enrolled at the University at Chapel Hill and who upon their most recent enrollment listed their home addresses as being outside Orange County; (2) ordered the Orange County Board to presume that any student applying to register was domiciled where his parents resided and to require that this presumption be rebutted by evidence in addition to the applicant's own statement of intention to reside permanently in Orange County; and (3) required the use by Orange County election officials and the maintenance on file for three years of a questionnaire.[3]

_____

3. Judge Bailey required that the questionnaire be substantially as follows:

   What is your occupation?

Lloyd v. Babb

Defendant members of the Orange County Board, defendant Kessler and applicant intervenors appealed. On 22 March 1978 the Court of Appeals stayed execution and enforcement of Judge Bailey's order pending appellate review. On 17 April 1978 we denied plaintiffs' motion to stay the Court of Appeals' stay order and certified the case to this Court for decision prior to a determination by the Court of Appeals.

I

Defendants' first assignment of error challenges the trial court's exercise of original jurisdiction in this case. Defendants' initial contention is that plaintiffs' claim should have been dismissed because they did not appeal the State Board's 30 March 1977 action. This argument is essentially based on the familiar principle that "[a]n action for mandamus may not be used as a substitute for an appeal." *Snow v. Board of Architecture*, 273 N.C. 559, 570, 160 S.E. 2d 719, 727 (1968). Defendants maintain that the

Did you leave your father's home for the temporary purpose of attending school or "of cutting loose from home ties"?

Do you keep your permanent possessions in the place you claim as your residence in Orange County, or do you keep there only enough for temporary needs?

If you were to fail at the university or were forced to discontinue your studies because of illness would you return to your parents' home?

Would you be living in the university town if the school were not there?

If tomorrow you were to transfer to a school in another town would you still consider your present residence in Orange County your home?

For what purposes other than attending school are you in this college town?

What occupation do you plan to follow upon graduation and where do you plan to follow it?

Where do you maintain church or lodge affiliations, if any?

Banking and business connections?

Do you have a car and where is it registered?

Whose name is it registered in?

What State is your driver's license registered in?

Have you listed taxes in Orange County? When:

Other statements made:

NAME: _____      _____
        (Please Print)                              Signature

ADDRESS: _____

Sworn to before me this _____ day of _____ , 19 _____ .

_____
Registrar or other person
authorized to register voters

decision of the State Board was "a final agency decision in a contested case" and that it can only be reviewed by an appeal to the superior court pursuant to the North Carolina Administrative Procedure Act. See G.S. 150A-43 to 150A-52. Specifically, defendants point to G.S. 150A-43:

> "Any person who is aggrieved by a final agency decision in a contested case, and who has exhausted all administrative remedies made available to him by statute or agency rule, is entitled to judicial review of such decision under this Article, unless adequate procedure for judicial review is provided by some other statute, in which case the review shall be under such other statute. Nothing in this chapter shall prevent any person from invoking any judicial remedy available to him under the law to test the validity of any administrative action not made reviewable under this Article."

Relying on the absence of specific provisions in the election laws for judicial review of decisions of the State Board, defendants argue that G.S. 150A-43 is the only basis for such review and that the review procedure must be in accordance with G.S. 150A-45 and 150A-46. Plaintiffs have not followed the procedures set forth in these statutes. Therefore, defendants conclude, plaintiffs cannot invoke the original jurisdiction of the superior court to challenge the actions of the State Board. *See Ponder v. Joslin,* 262 N.C. 496, 138 S.E. 2d 143 (1964); *Axler v. City of Wilmington,* 25 N.C. App. 110, 212 S.E. 2d 510 (1975).

[1, 2]  We cannot accept defendants' argument because we do not agree that the State Board's 30 March 1977 meeting was a "contested case." G.S. 150A-2(2) defines a "contested case":

> " 'Contested case' means any agency proceeding, by whatever name called, wherein the legal rights, duties or privileges of a party are required by law to be determined by an agency after an opportunity for an adjudicatory hearing. Contested cases include, but are not limited to, proceedings involving rate-making, price-fixing and licensing. Contested cases shall not be deemed to include rule making, declaratory rulings, or the award or denial of a scholarship or grant."

Under this definition there are two elements of a "contested case": (1) an agency proceeding, (2) that determines the rights of a

party or parties. *See* Daye, *North Carolina's New Administrative Procedure Act: An Interpretive Analysis,* 53 N.C.L. Rev. 833, 868-72 (1975). Since the second element was missing from the State Board's 30 March 1977 meeting it was not a "contested case" within the meaning of the statute.

The State Board has investigatory, supervisory, and adjudicatory powers. Its 30 March 1977 meeting was held pursuant to the first two rather than the third. The State Board had received petitions purportedly signed by several hundred Orange County residents alleging registration irregularities and asking for relief. At the request of two of its own members, it held a public meeting to investigate these charges. The meeting was conducted informally. The State Board heard from a number of interested parties. After consideration of the allegations and information before it the State Board decided that further proceedings were not appropriate. This determination did not affect the rights of any of the parties. The petitioners remained free to pursue other appropriate administrative or judicial remedies. The State Board simply decided not to go forward with further *investigation* of alleged registration irregularities. A decision to end a preliminary inquiry is not "a final agency decision in a contested case." *Accord, Miller v. Alcoholic Beverages Control Comm.,* 340 Mass. 33, 162 N.E. 2d 656 (1959). There was nothing for plaintiffs to appeal so as to invoke the judicial review powers, or appellate jurisdiction, of the superior court. Plaintiffs' failure to appeal from the State Board, therefore, would not in itself warrant dismissal of this action.

II

[3] Defendants next argue that plaintiffs' claim should be dismissed for their failure to exhaust administrative remedies. The basis for this claim is plaintiffs' failure to resort to statutory procedures for challenging voters before filing this action. While testimony on this point is somewhat equivocal, a fair reading of the record establishes that prior to filing this complaint, plaintiffs had not used the challenge procedure provided by statute to correct the problems of which they complain.[4]

4. The record shows, however, that in the week before the hearing in this matter approximately 6000 challenges were filed against voters registered in Orange County by members of the Orange Committee and others.

Challenges are governed by Article 8 of Chapter 163 of the General Statutes. G.S. 163-85(a) states that other than on the day of a primary or general election "[a]ny registered voter of the county may challenge the right of any person to *register, remain registered or vote* in the county." (Emphasis supplied.) General Statute 163-85(b) establishes the procedure for such challenges:

> "Challenges shall be made to the county board of elec-
> tions. Each challenge shall be made *separately.* The burden
> of proof shall be on the challenger in each case. Each
> challenge shall be made in writing and, if they are available,
> shall be made on forms prescribed by the State Board of
> Elections. Each challenge shall specify the reasons why the
> challenged voter is not entitled to be or remain registered or
> to vote." (Emphasis supplied.)

General Statute 163-86 provides for a hearing on the challenge before the county elections board at which the challenged registrant has a right to be present and witnesses may be heard. Challenges to the right of a person to vote may also be filed on the day of a primary or general election under the procedures set out in G.S. 163-87. Again under these provisions, determinations are to be made on an individual basis and an opportunity for hearing before the county elections board is provided.

Defendants contend that when there is an adequate, complete and appropriate statutory remedy, a challenge to voter registration is not cognizable in equity. *See Starkey v. Smith,* 445 Pa. 118, 283 A. 2d 700 (1971). They characterize Article 8 of Chapter 163 as such a remedy and urge that plaintiffs' complaint be dismissed. Plaintiffs respond by arguing that however complete the challenge procedure appears on its face, it is not an effective or adequate remedy in this case. First, plaintiffs say that the sheer number of unqualified voters makes use of the challenge method impractical. Second, they contend that the Orange County Board, whose members and officials they accuse of  having registered students in violation of the law, would not properly determine challenges in hearings conducted by it for this purpose and that there is no appeal from such determinations by the Orange County Board.

A pleading that alleges inadequacy of administrative remedy states a claim upon which equitable relief may be granted if the

circumstances warrant it. *See* 2 Cooper, State Administrative Law 579 (1965). Plaintiffs here allege the failure of the Orange County Board and its officials to comply with state election law, and the presence of a large number of persons, allegedly between 6000 and 10,000, on the voting rolls who are not entitled to be registered. Added to these allegations at various points in the complaint is the legal conclusion that plaintiffs have no adequate remedy at law and must have redress, if at all, in equity.

This issue is before us on a motion to dismiss for failure to state a claim upon which relief could be granted. *See* G.S. 1A-1, Rule 12(b)(6). " 'A motion to dismiss is the usual and proper method of testing the legal sufficiency of the complaint. For the purpose of the motion, the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of facts are not admitted.' " *Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E. 2d 161, 163 (1970), *quoting* 2A Moore's Federal Practice § 12.08 (2d ed. 1968). Thus, while we are to treat as true plaintiffs' factual allegations, it is our task to determine whether these allegations as a matter of law demonstrate the adequacy, or lack thereof, of legal administrative remedies.

Our examination of prior law in this jurisdiction reveals only one case that has dealt with this precise issue. Plaintiffs in *Glenn v. Culbreth*, 197 N.C. 675, 150 S.E. 332 (1929), brought suit seeking an injunction against the use of a registration in a primary election and a mandamus for a new registration. They alleged that voters for a municipal election in Raleigh had been illegally registered. Among several alternative grounds for its holding that plaintiffs were not entitled to injunctive relief, the Court stated, *id.* at 679, 150 S.E. at 333-34:

> "Moreover, the plaintiff[s] had an adequate remedy at law. The charter of the city of Raleigh, Article VII, provides that every person who shall vote in the city primary 'shall be subject to the challenge made by any resident of the city of Raleigh under such rules as may be prescribed by the board of commissioners, and such challenge shall be passed upon by the judges of elections and registrars,' etc. The general election law provides the same remedy in C.S., 5972."

*Glenn* is factually distinguishable from the present case because plaintiffs there made no allegations that any of the voters im-

properly registered were not qualified to be registered, or as to the number of those improperly registered and their possible effect on the outcome of elections.

*Glenn* is, however, in accord with a number of decisions that when an *effective* administrative remedy exists, that remedy is exclusive. *See King v. Baldwin,* 276 N.C. 316, 172 S.E. 2d 12 (1970); *Church v. Board of Education,* 31 N.C. App. 641, 230 S.E. 2d 769 (1976); *Wake County Hospital v. Industrial Commission,* 8 N.C. App. 259, 174 S.E. 2d 292 (1970). Our inquiry must therefore be, taking plaintiffs' factual allegations as true, whether the challenge procedure is an effective administrative remedy for the wrongs of which they complain.

Plaintiffs seek to end what they allege to be illegal practices on the part of Orange County election officials and to have guidelines laid down for the future. In this plaintiffs are essentially attempting to require election officials to perform their legal duties. Plaintiffs' standing to make such a claim has not been challenged. Nor should their failure to make challenges preclude them from seeking this kind of relief. If plaintiffs' allegations are true, the challenge procedure would not provide an effective remedy. The challenge procedure might correct past wrongs by removing from the voting rolls those who had been improperly registered. It could do nothing, however, to halt ongoing improprieties nor could it prevent future ones. In summary, insofar as plaintiffs allege continuing improprieties in the registration practices of the Orange County Board and its officials they have stated a claim upon which relief can be granted.

The relief which can be granted is, however, more restricted than that which plaintiffs seek. Judicial purging of voter registrants is not an available remedy here. It is duplicative of the challenge process. Plaintiffs argue nevertheless that they may seek a judicial remedy that is virtually identical to an administrative remedy because of the number of voters involved and because of the possibility that challenges may not be fairly heard by the Orange County Board. We find both arguments unpersuasive. Notwithstanding the practical difficulty in challenging individually a large number of registrants, there is in this case no other proper course. Domicile is necessarily a matter that must be determined on an individual basis; there is no ap-

propriate way to make a group determination. As Justice Sharp, now Chief Justice, said in *Hall v. Board of Elections, supra*, 280 N.C. at 607-08, 187 S.E. 2d at 56:

> "The question whether a student's voting residence is at the location of the college he is attending or where he lived before he entered college, is a question of fact which depends on the circumstances of each individual's case."

No one fact is determinative of domicile. In addition, proof of improper registration practices by the Orange County Board is not proof that voters so registered were not domiciled in Orange County.

Finally, judicial review of decisions in challenge hearings would be available in that mandamus would lie to correct any "clear abuse of discretion" in the Orange County Board's rulings. *See Sutton v. Figgatt*, 280 N.C. 89, 93, 185 S.E. 2d 97, 99 (1971); *Insurance Co. v. Ingram, Comr. of Insurance*, 34 N.C. App. 619, 240 S.E. 2d 460 (1977).

Because plaintiffs will be entitled to some of the relief they seek if they prove their allegations, Judge Bailey was correct in denying defendants' motion to dismiss. Judge Bailey included, however, the following provision in his 7 March 1978 order:

> "The defendants, Joseph L. Nassif, Evelyn Lloyd and Lillian Lee, in their official capacity as members of the Orange County Board of Elections and their successors in office be, and they are hereby directed to purge from the voter registration books of Orange County the names of all persons now registered to vote who are enrolled as students at the University of North Carolina at Chapel Hill and who upon their most recent enrollment gave their home address as a place outside of Orange County, North Carolina."

Plaintiffs as we have pointed out are not entitled to this relief under any showing they could make. It was therefore error to grant it.

### III

Defendants' next assignments of error go to the granting of preliminary injunctive relief in plaintiffs' favor. We now examine

the remaining portions of the 7 March 1978 order to determine whether there was sufficient evidence to support them. These portions of the order are:

"NOW, THEREFORE, IT IS ORDERED that:

. . . .

"2. That in making a decision as to whether an applicant for registration is domiciled in Orange County and is thus qualified to register and vote in Orange County, the defendant, Orange County Board of Elections, and all persons authorized by them to register voters, shall presume that any applicant who is enrolled at the University of North Carolina at Chapel Hill, is domiciled in the place of residency of such student's parents and shall require such applicant to rebut that presumption by evidence in addition to the applicant's own statement that he or she intends to reside permanently in Orange County.

"3. That any person applying for registration to vote in Orange County after the date of the signing of this Order shall be required by the defendant, Orange County Board of Elections, and all election officials who are now or who may hereafter be appointed by the said Board of Elections to register voters, to answer a series of questions and sign his or her name to such questions, which questions shall be on a form substantially as set forth in Exhibit A of this Order which Exhibit is made a part hereof and such statement or form of questions shall be preserved by the defendant, Orange County Board of Elections, for no less than three years after such application for registration is made; and such written statement or form shall be made available by the Orange County Board of Elections for inspection by the public during normal office hours."[5]

[4]   This order amounts to a preliminary mandatory injunction. Our courts have power to enter such an order, *see Woolen Mills v. Land Co.*, 183 N.C. 511, 112 S.E. 24 (1922), provided it is supported by the evidence. In order for a preliminary mandatory injunction to be issued, there must generally be "*a clear showing* of *substantial injury* to the plaintiff, pending the final hearing, if the

---

5. The questions referred to are set forth in note 3, *supra*.

existing status is allowed to continue to such a hearing." *Huggins v. Board of Education*, 272 N.C. 33, 40, 157 S.E. 2d 703, 707 (1967). (Emphasis supplied.)

**[5]** Defendants have excepted to all Judge Bailey's findings of fact. We need discuss only the fifth one here, which is:

> "That the defendant, Orange County Board of Elections, has not placed the burden of proof upon students who apply for registration to demonstrate that the bona fide domicile of such students is Orange County."

This is the crucial finding upon which the relief granted in the portion of the order now under consideration rests. If there is no evidence to support this finding, then these portions of the order cannot stand. Even if there is some evidence in the record to support the finding, we are not bound by it. "On appeal from the order of a superior court judge granting or refusing a preliminary injunction the Supreme Court is not bound by the findings of fact of the hearing judge but may review and weigh the evidence and find the facts for itself." *Setzer v. Annas*, 286 N.C. 534, 537, 212 S.E. 2d 154, 156-57 (1975).

Plaintiffs presented testimony from ten witnesses. Raymond E. Strong testified that in the spring semester of 1978, there were 19,139 students enrolled at the University, 15,102 of whom were North Carolina residents and 4037 of whom were from outside the state. James O. Cansler testified as to the number of students living in university housing, private dormitories, fraternities and sororities, and gave the location of these housing units. Frederick A. Russ testified that a survey of the student body indicated that 14.8% of those responding were registered to vote in Orange County. William C. Ray, William C. Dorsett, John T. Walker and Frank Miller testified that their examination of the voting rolls in several precincts revealed that a substantial percentage of the persons registered to vote in those precincts were students. In sum, all of the testimony by these witnesses tended to establish the number of students at the University, where they lived and, to an extent, how many of them were registered to vote. None of it tended to show that the Orange County Board had registered students in violation of the law.

Plaintiffs next examined two students, Winston Earl Lane III and Jimmy Warren Adcock. Both were undergraduates and were

registered to vote in Orange County. Both were asked various questions apparently intended to determine whether they were actually entitled to be registered in Orange County. Neither could remember whether they were asked any specific questions about their domicile when they registered.

Plaintiffs' last witness was William Melvin Ward, who testified on direct examination that he was and had been for 20 years the Democratic Judge in Carr Precinct. He had attended all meetings called by the Orange County Board for election officials. According to Mr. Ward the Board gave no instructions regarding registration of student voters before 1977. At a meeting in 1977 instructions were given by Mr. Lonnie Coleman to the effect that "if a student went to a registrar and was asked if his dormitory was his personal residence, if he said yes, that the registrar must register him." Mr. Ward recalled no instructions as to questions of a more specific nature about a student's domicile.

On cross-examination, the following exchange took place between Mr. Ward and Mr. Coleman, attorney for defendants:

"Q. Mr. Ward, you say you do recall attending an instruction seminar in 1977?

A. Yes, sir.

Q. Do you recall me, sir, reading to that—to you and to other members who were there instructions that had been sent to the County Board of Elections by the State Board of Elections? Do you recall that, sir?

A. I think you said it was—the legislature had—had passed this law is the way I understood it.

Q. Do you recall me, sir, reading to you and to other people who were there instructions that the State Board of Elections had sent that came out of the case entitled Hall versus Board of Elections? Do you recall that, sir?

A. No, I do not.

Q. Do you recall me, sir, reviewing the facts of that case, Hall versus Elections?

A. No.

Q. Board of Elections? You don't recall that?

A. No, I don't. *Well, see, I—I wasn't from Chapel Hill and—and I—I wasn't too interested, I mean too concerned about it, because I knew I wouldn't be involved in it.*

Q. I see. Do you recall, sir, me reading a list of questions that the Supreme Court had said were appropriate questions to ask of anyone who may be a student seeking to register? Do you recall those questions?

A. No, sir.

. . . .

Q. Do you recall, sir, signing your name as a participant in the—in the seminar that night? Do you recall signing your name when you came in the door?

A. Um huh. Yes, sir.

Q. And—and do you recall receiving a—a brown envelope, a package that had some materials in it?

A. Oh, the registrar—I'm a judge. The registrar gets that.

Q. Do you recall getting one of those?

A. . . . .?

Q. Um huh.

A. Naw. I probably—I probably did, but I don't recall it. I don't say that I didn't get it.

COURT: It's a lost cause.

Q. Mr. Ward, what was the statement, sir, that you said that I made that night?

A. To the best of my knowledge, you said if a student went to a registrar to ask to register that the registrar was required to ask him if he called his dormitory his permanent residence and if he said yes you—you were supposed to register him.

Q. All right. Do you recall other questions that I referred registrars that night to to ask people who were attempting to register?

A. Not offhand, I don't.

Q. That's the only question you recall, sir?

A. Yes, sir." (Emphasis supplied.)

At the conclusion of Mr. Ward's testimony, Mr. Coleman stated that he could present witnesses whose testimony would tend to show (1) that registrars had been instructed in accordance with a State Board memorandum relating to conformity with *Hall v. Board of Elections, supra,* 280 N.C. 600, 187 S.E. 2d 52, and (2) that many, if not all, registrars in fact made inquiry into the domicile of those seeking to register. To this offer of proof, Mr. Cheshire, attorney for plaintiffs, replied:

"If your Honor please, I think we would be willing to stipulate probably that their witnesses would testify essentially to what Mr. Coleman said they would testify to without conceding that they're telling the truth about it."

On oral argument, counsel for plaintiffs argued that Mr. Cheshire did not actually concede such testimony would be forthcoming, making much of the word "probably." This argument seems patently frivolous. Clearly Mr. Cheshire stipulated the existence but not the veracity of such testimony. The substance of the proferred testimony, as given by Mr. Coleman, should be weighed along with the remainder of the evidence in determining the sufficiency of the evidence to support Judge Bailey's fifth finding.

The evidence set out above constitutes all that was before Judge Bailey relative to this issue. We find it inconclusive. The testimony of the first seven witnesses relates only to the number of students registered and where they were registered. The testimony of the two students shed no light on registration practices, since neither of them remembered what, if any, questions he had been asked. Mr. Ward's testimony on direct examination tended to show either that Orange County registrars had not been instructed about proper registration practices or had been instructed incorrectly. On cross-examination, however, he

remembered few details of the meeting at which the alleged incorrect instruction was given and admitted that he was not paying close attention when the matters he was testifying to were discussed. Balanced against Mr. Ward's statements is Mr. Coleman's offer of testimony that would tend to show that the registrars had been properly instructed and that they were complying with the law.

On the basis of this evidence, it was error for Judge Bailey to have made his fifth finding. The evidence simply failed to show sufficiently that the Orange County Board had not required students to prove their domicile. Without this showing the second and third parts of Judge Bailey's order cannot stand. For this reason and the reasons stated in part II above, we vacate Judge Bailey's order of 7 March 1978 except insofar as it dismisses the action against members of the State Board.

## IV

Defendant Kessler, along with applicant intervenors, next asks us to modify substantially our decision in *Hall v. Board of Elections, supra,* 280 N.C. 600, 187 S.E. 2d 52. They contend the principles governing registration of student voters set out in *Hall* are in conflict with the Equal Protection Clause of the United States Constitution. In order to evaluate this claim, it is necessary first to examine the requirements of *Hall* and then to determine precisely what the Equal Protection Clause requires in this area.

*Hall* was decided in 1972, shortly after the ratification of the Twenty-Sixth Amendment to the United States Constitution gave eighteen year olds the right to vote. It was the first case in which this Court dealt with the issue of a student's "residence" for purposes of registering to vote. The Court in *Hall* first concluded that "residence" as used in our election statutes meant "domicile." *Id.* at 606, 187 S.E. 2d at 55. Then, drawing on our law of domicile and on cases from other jurisdictions, the Court enunciated the following principles, *id.* at 607-09, 187 S.E. 2d at 56-57: (1) A student's residence for voting purposes is a question of fact dependent upon the circumstances of each individual case. (2) Domicile may be proved by both direct and circumstantial evidence. (3) There is a rebuttable presumption that a student who leaves his parents' home to go to college is not domiciled in

the place where the college is located. (4) An adult student may acquire a domicile in the place where his college is located if he regards that place as his home and intends to remain there indefinitely.

These principles were rooted in the law of domicile. Since *Hall,* however, there has been a substantial volume of litigation in student voting cases in which traditional concepts of domicile and the means of implementing them were challenged on the grounds that they deny would-be student voters equal protection of the laws. *See* Annotation, Residence of Students for Voting Purposes, 44 A.L.R. 3d 797. These challenges have been described as a "second generation of voting rights cases." *Newburger v. Peterson,* 344 F. Supp. 559, 561 (D.N.H. 1972).

Some of these cases and their holdings may be summarized as follows. In *Wilkins v. Bentley,* 385 Mich. 670, 189 N.W. 2d 423 (1971), the Michigan Supreme Court struck down a statute that had been interpreted to create a rebuttable presumption that students were not residents of the locality where they were attending an institution of learning. In addition, the court held that no special forms, questions, identifications or the like could be required of students if they were not required of others. In *Worden v. Mercer County Board of Elections,* 61 N.J. 325, 294 A. 2d 233 (1972), the New Jersey Supreme Court held that students seeking to register could not be subjected as a class to questioning beyond that to which other applicants were subjected. In addition, the court held that all bona fide student residents had to be allowed to register including "(1) those who plan to return to their previous residences, as well as (2) those who intend to remain permanently in their college communities, (3) those who plan to obtain employment away from their previous residences, and (4) those who are uncertain as to their future plans." *Id.* at 348, 294 A. 2d at 245. In *Newburger v. Peterson, supra,* 344 F. Supp. 559, a three-judge court struck down as unconstitutional a New Hampshire statute that had been interpreted as making "an intention to remain permanently or indefinitely in a particular town as essential to the acquisition of domicile" for voting purposes. *Id.* at 560. In other words, the *Newburger* court held that if a person had the other requisites for domicile, he must be allowed to vote even if he had an intention to leave at a fixed time in the future. In *Ramey v. Rockefeller,* 348 F. Supp. 780 (E.D.N.Y. 1972), a

three-judge court held that "in determining bona fide residence for a person physically present, the state cannot constitutionally go further than . . . [requiring] that he 'must intend to make that place his home for the time at least.'" *Id.* at 788. Lastly, in *Whatley v. Clark*, 482 F. 2d 1230 (1973), *cert. denied*, 415 U.S. 934 (1974), the United States Court of Appeals for the Fifth Circuit held that a Texas statute which created a rebuttable presumption that a student was not a resident for voting purposes of the place where he attended school was violative of the Equal Protection Clause.

[9]   As our analysis below will show we disagree with the extent to which many of these cases have carried the Equal Protection Clause in student voting cases. The United States Supreme Court cases in this area, the "first generation" voting rights cases upon which the foregoing decisions are based, do not require us to retreat from *Hall* insofar as *Hall* established the factors which might be considered and the procedure to be used in determining domicile. These United States Supreme Court cases, however, and other persuasive authorities do impel us to hold now that a student who intends to remain in his college community only until graduation should not for that reason alone be denied the right to vote in that community. Insofar as *Hall* may be interpreted to the contrary, it is modified accordingly.

These cases begin with *Carrington v. Rash*, 380 U.S. 89 (1965). Petitioner in *Carrington*, a sergeant in the United States Army, challenged a provision of the Texas Constitution which prevented a member of the armed services from another state who moved to Texas from acquiring domicile there while he or she remained on military duty. Texas argued that the provision should be upheld because it served two valid state purposes: (1) "immunizing its elections from the concentrated balloting of military personnel, whose collective voice may overwhelm a small local civilian community"; and (2) "protecting the franchise from infiltration by transients." *Id.* at 93. The Supreme Court conceded that the states have the power to impose reasonable regulations on access to the franchise:

"Texas has unquestioned power to impose reasonable residence restrictions on the availability of the ballot. . . . There can be no doubt either of the historic function of the States to establish, on a non-discriminatory basis, and in ac-

cordance with the Constitution, other qualifications for the exercise of the franchise." *Id.* at 91.

The Court concluded, however, that there was no reasonable basis for the classification Texas had made and struck it down as violative of the Equal Protection Clause. In reply to Texas' first argument, the Court stated: " 'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Id.* at 94. As to the second argument, the Court agreed that Texas could take "reasonable and adequate steps" to deal with the special problems presented by soldiers and other transient populations, but it found the irrebuttable presumption used in the case of military personnel not sufficiently "precise . . . to determine the bona fides of an individual claiming to have actually made his home in the State long enough to vote." *Id.* at 95.

*Carrington* represented a departure from prior treatment of state classifciations for voting. Before *Carrington* and the reapportionment cases decided at about the same time, *e.g., Reynolds v. Sims,* 377 U.S. 533 (1964), it had been thought "that the Equal Protection Clause was not intended to touch state electoral matters." *Carrington v. Rash, supra,* 380 U.S. at 97 (Harlan, J., dissenting). *Carrington* and its contemporaries evidenced a new concern on the part of the Supreme Court that the right to vote, "a fundamental political right, because preservative of all rights," *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886), be shared equally by all citizens. This concern has been apparent in a number of cases striking down barriers that prevented a significant number of citizens from voting. Three of these cases have particular relevance to the issues under consideration here.

In *Kramer v. Union Free School District No. 15,* 395 U.S. 621 (1969), the Court invalidated a New York law limiting the electorate in school district elections to those owning property in the district and those with children enrolled in the local schools. *Kramer* is noteworthy for the test it articulates for measuring voting classifications against the requirements of the Equal Protection Clause: "[I]f a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest." *Id.* at 627.

### Lloyd v. Babb

In *Evans v. Cornman*, 398 U.S. 419 (1970), the Court upheld an injunction barring Maryland officials from denying residents at the National Institutes of Health, a federal enclave, the right to vote in the state. Maryland argued that it was necessary to exclude residents of this enclave from voting in order "to insure that only those citizens who are primarily or substantially interested in or affected by electoral decisions have a voice in making them." *Id.* at 422. The Court rejected this argument, finding that residents of the enclave had as much stake[6] in Maryland elections as other Maryland residents notwithstanding the state's jurisdiction over them was limited in certain respects.

Lastly, in *Dunn v. Blumstein*, 405 U.S. 330 (1972), the Court struck down Tennessee's requirement that in order to vote one must have been a resident of the state for one year and of the county where one was registering for three months. The Court emphasized "that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Id.* at 336. It also made it clear that state laws which had the effect of "totally denying . . . the opportunity to vote" must be justified by "a substantial and compelling reason." *Id.* at 335. The Court was able to discern no such justification for Tennessee's lengthy residency requirement.

The most important aspect of Dunn for our purposes, however, is the careful distinction it drew between durational residence requirements and bona fide residence requirements:

> "We emphasize again the difference between bona fide residence requirements and durational residence requirements. We have in the past noted approvingly that the States have the power to require that voters be bona fide residents of the relevant political subdivision. An *appropriately defined and uniformly applied requirement of bona fide residence* may be necessary to preserve the basic conception of a politi-

---

6. The Court noted, *id.*, at 424:

"[I]f elected representatives enact new state criminal laws or sanctions or make changes in those presently in effect, the changes apply equally to persons in NIH grounds. . . . Further, appellees are as concerned with state spending and taxing decisions as other Maryland residents, for Congress has permitted the States to levy and collect their income, gasoline, sales, and use taxes—the major sources of state revenues—on federal enclaves. . . . State unemployment laws and workmen's compensation laws likewise apply to persons who live and work in federal areas. . . . Appellees are required to register their automobiles in Maryland and obtain drivers' permits and license plates from the State; they are subject to the process and jurisdiction of state courts; they themselves can resort to those courts in divorce and child adoption proceedings; and they send their children to Maryland public schools."

cal community, and therefore could withstand close constitutional scrutiny. But durational residence requirements, representing a separate voting qualification imposed on bona fide residents, must be separately tested by the stringent standard." Id. at 343-44. (Citations omitted and emphasis supplied.)

**[6]** *Carrington, Kramer, Evans* and *Dunn* read together, establish these basic propositions: (1) any state law which tends to affect the right to vote by way of making classifications must be scrutinized for conformity with the Equal Protection Clause; (2) state laws which have the effect of denying certain classes the right to vote must have a compelling justification; (3) *appropriately defined* and *uniformly applied* bona fide residence requirements are permissible; and (4) otherwise eligible persons who reside in a community and are subject to its laws must be permitted to vote there even though their interests may differ from the majority of the community's residents.

**[7]** Applying these propositions to the principles set out in *Hall,* we see no difficulty with the proposition that domicile can be proved by various kinds of direct and circumstantial evidence. Three types of arguments have been advanced against the type of evidentiary inquiry endorsed by *Hall.* Defendant Kessler and applicant intervenors argue that it is an unjustifiable intrusion into the private affairs of students seeking to register to vote. Elsewhere, it has been argued that inquiries into bank accounts, ownership and location of property, vacation plans and the like (all of which were approved by *Hall*) amount to attempts to make unconstitutional classifications on the basis of wealth, travel and property ownership. *See Wilkins v. Bentley, supra,* 385 Mich. 670, 189 N.W. 2d 423. Lastly, defendants argue at least by implication that it is not permissible to make such inquiries of students when they are not made of others.

Taking these arguments in turn, we regret that there is ever a need for the state to interfere in the private affairs of citizens, but minimal intrusions are often a price we must pay for living in an organized society. The power of the state to require that voters be bona fide residents is unquestioned. *Dunn v. Blumstein, supra,* 405 U.S. 330; *Carrington v. Rash, supra,* 380 U.S. 89. A corollary must be that the state has authority to determine whether

a person is a bona fide resident. To hold otherwise would mean the state is bound by a would-be registrant's declaration of residency. Such a result is not constitutionally required.

Turning to the second argument, we do not agree that asking the kind of questions approved by *Hall* amounts to the making of impermissible classifications on the basis of wealth, property ownership, etc. This contention results from a misunderstanding of the purpose of these questions. No one factor can be determinative of domicile. Each factor referred to in *Hall* has some relevance to domicile. The presence or absence of any one of them, or even a combination of them, may not be conclusive. Thus the inquiries approved in *Hall* are reasonably calculated to determine domicile. They do not result in the claimed, and obviously impermissible, classifications.

Defendants' strongest argument on this point is that it is impermissible to make such inquiries of students when they are not routinely made of other would-be registrants.[7] A number of courts have accepted this contention. *See, e.g., Worden v. Mercer County Board of Elections, supra,* 61 N.J. 325, 294 A. 2d 233 (1972); *Sloane v. Smith,* 351 F. Supp. 1299 (M.D. Pa. 1972); *Shivelhood v. Davis,* 336 F. Supp. 1111 (D. Vt. 1971); *Bright v. Baesler,* 336 F. Supp. 527 (E.D. Ky. 1971). Our view is that the requirements of the Equal Protection Clause do not go so far.

Defendant Kessler and applicant intervenors argue that we must apply the "compelling state interest" test of *Kramer* and *Dunn* and, upon doing so, must find that the practice of asking students questions not asked of others is unconstitutional. *Kramer* and *Dunn* are not, however, controlling here. They, along with *Carrington* and *Evans,* involved practices that deprived bona fide residents of the right to vote. Involved here is a determination whether a person is a bona fide resident. In both *Carrington* and *Dunn,* the Supreme Court made it clear that the states could classify persons as residents and non-residents and forbid non-residents from voting. We are here dealing only with the methods of making that classification and not with the deprivation of the

---

7. Perhaps we could avoid this question by noting that Judge Bailey ordered *all* persons seeking to register to vote to fill out the form set forth in note 3 *supra.* Upon examination, however, it is clear that the questions are taken from *Hall* and that they are for the most part meaningless when applied to anyone except college students. Casting wide a net that could catch only one classification of voters may still be a violation of the Equal Protection Clause.

right to vote of one who is or could be determined to be a resident. Such methods should be upheld if they are reasonable.

With the issue thus stated, we find nothing improper in making special inquiries of students as to their domicile.

"There is nothing wrong or even suspect in registration officials asking college boarding students, whose permanent addresses are outside the county, certain questions to determine residency and their qualifications." *Dyer v. Huff,* 382 F. Supp. 1313, 1316 (D.S.C. 1973), *aff'd without opinion,* 506 F. 2d 1397 (4th Cir. 1974).

By nature of the activities they are engaged in, students are a transient group. Many retain ties to their prior homes which are far stronger than any they have in their student community. In short, their characteristics as individuals make them as a group a special problem for election officials. Moreover, students are one of the few, if not the only, markedly mobile groups of sufficient numbers to have a decisive impact on elections.

These factors make it reasonable for election officials to inquire of students seeking to register more thoroughly than of other persons. "It is not a violation of equal protection to select for individual inquiry categories of citizens presenting the most obvious problems . . . as long as the ultimate standard is the same for all. . . ." *Ramey v. Rockefeller, supra,* 348 F. Supp. at 786. This additional screening procedure is not an impermissible attempt to "fence out" a segment of the community because of the way they may vote. It is instead a permissible attempt to determine who are the members of the relevant community.

Lastly, we do not agree with the argument raised by defendants that the standards to be applied in making inquiries are so vague that their use is a violation of due process. The basis for this argument is that "inconsistent results" may follow the use of questions. Such is the case any time determinations based on individual circumstances are made. It is also the only way that individual determinations can be made. A person aggrieved by a decision made in his case may appeal to the county board of elections and from there to the courts. *See* G.S. 163-75 through 163-77.

[8] Moving to the next of *Hall's* principles that has been called into question here, we find no denial of equal protection in the

use of a rebuttable presumption that a student who leaves his parents' home to go to college is not domiciled in the place where the college is located. Two courts in Texas and Michigan have found similar rebuttable presumptions unconstitutional. *Whatley v. Clark, supra,* 482 F. 2d 1230; *Wilkins v. Bentley, supra,* 385 Mich. 670, 189 N.W. 2d 423. We do not reach the same result, however, because we view the effect of the presumption here differently than did those courts. The rebuttable presumption approved in *Hall* does not treat students differently from the rest of the population. It is merely a specialized statement of the general rule that the burden of proof is on one alleging a change in domicile. *See Reynolds v. Cotton Mills,* 177 N.C. 412, 99 S.E. 240 (1919). The decision as to domicile is based solely on the evidence adduced, with the student like any other person bearing the ultimate burden of persuasion. We find no constitutional violation in the use of this procedure.

[9] Despite the fact that special inquiries and rebuttable presumptions are valid on their faces, they may be applied to work as effectively, if more subtly, the same kind of discriminatory deprivation of the right to vote as the irrebuttable presumption of *Carrington* or the durational residency requirement of *Dunn.* Such a result occurs when, in effect, a different standard of domicile is applied to students than to other segments of society. This may be the inevitable consequence of the rule in *Hall* governing how a student may acquire domicile in a college town, 280 N.C. at 608, 187 S.E. 2d at 57:

> "An adult student may acquire a domicile at the place where his university or college is situated, if he regards the place as his home, or intends to stay there indefinitely, and has no intention of resuming his former home. If he goes to a college town merely as a student, intending to remain there only until his education is completed and does not change his intention, he does not acquire a domicile there."

The second quoted sentence may be interpreted to mean that a student must intend to stay in a college town not only until he graduates but also until some indefinite time beyond that date. So interpreted the rule makes it effectively more difficult for a student to establish a new domicile than for other members of the population. It would not then be an "appropriately defined and

uniformly applied requirement of bona fide residence" under *Dunn.* We do not believe the sentence should be so interpreted. So long as a student intends to make his home in the community where he is physically present for the purpose of attending school *while* he is attending school and has no intent to return to his former home after graduation, he may claim the college community as his domicile. He need not also intend to stay in the college community beyond graduation in order to establish his domicile there.

The requisites for domicile are legal capacity, physical presence and intent to acquire domicile. Restatement Second, Conflict of Laws § 15. An intent to acquire domicile requires both an intent to abandon one's prior domicile and an intent to remain at the new domicile. *Hall v. Board of Elections, supra* at 608-09, 187 S.E. 2d at 57. Abandonment of one's prior domicile and adoption of a new domicile may be shown by both declarations of the registrant and objective facts. The latter should be obtained by appropriate inquiries directed to the registrant by the registrar. *Hall* requires that the statement of intent to remain be that the student intend to stay "indefinitely."

An intent to remain indefinitely has firm roots in the law of domicile and is incorporated in part in our voting statute. *See* G.S. 163-57(5). "Indefinitely," however, is a term susceptible to many meanings. The meaning applied in *Hall* suggests that one does not have the requisite intent to remain indefinitely in a place for purposes of establishing that place as his domicile if he plans to leave at the happening of some specified future event such as graduation. Other cases, by contrast, have been satisfied that there was an intent to stay indefinitely when there was simply not an intention to leave presently. *Berry v. Wilcox,* 44 Neb. 82, 62 N.W. 249 (1895); *Putnam v. Johnson,* 10 Mass. 488 (1813); *Chomeau v. Roth,* 230 Mo. App. 709, 72 S.W. 2d 997 (1934).

We are convinced this latter definition is routinely applied to persons other than students who seek to register to vote. Ours is an increasingly mobile society. In 1970, for example, 40.7% of the population of North Carolina 5 years old and older were living in a house different from the one they lived in in 1965. Statistical Abstract of the United States, at 37, table 47 (1977). If searching inquiry were made and if the proper questions were posed, pros-

pective voters in other walks would respond that they planned to stay until they were promoted, until they got a new or different job, until they retired, until a contract was finished, until a term of office was over, until an election was won or lost, and so on. "Graduation" is no more or less certain to occur than these other events. Neither, quite often, are students' plans after graduation more or less certain than plans of others pending the occurrence of one of these other events. But questions are not asked and people who would admit to plans to leave are routinely registered to vote. Such questions are, however, asked of students. The result cannot help but be discriminatory even if the intent is otherwise:

> "[I]n these days of an increasingly mobile society, it would be the rare citizen who could swear honestly that he intended to reside at his present address permanently; even if the test of indefinite intention is different, there would undoubtedly be many citizens with 'definite' hopes of moving to better job opportunities, more pleasant climates, and the like. If such a test were in fact imposed on all citizens, it would go too far in restricting the vote to the more immobile elements of the populace; it would penalize, perhaps irrationally, those who make definite plans, while allowing the drifters who have uncertain plans to vote. And if the test [is] in fact only applied to students, then it [is] an impermissible discrimination against them." *Ramey v. Rockefeller, supra,* 348 F. Supp. at 788.

Many courts which have struggled with the issue of where students reside for voting purposes have interpreted their law of domicile to permit them to claim their student community as their domicile even though they intended to remain only until graduation. The earliest such case we could find was *Putnam v. Johnson, supra,* 10 Mass. 488, which was decided in 1813. Plaintiff in *Putnam* was a student in Andover, Massachusetts, who had clearly severed all ties with his prior home. Defendants refused to allow him to vote in Andover because he was there only for the purpose of receiving an education. The Massachusetts Supreme Court ordered that he be allowed to vote in Andover and used the following noteworthy language, *id.* at 501:

> "In this new and enterprizing country it is doubtful whether one half of the young men, at the time of their emancipation,

fix themselves in any town with an intention of always staying there. They settle in a place by way of experiment, to see whether it will suit their views of business and advancement in life; and with an intention of removing to some more advantageous position, if they should be disappointed. *Nevertheless they have their home in their chosen abode while they remain. . . . [H]abitation fixed in any place, without any present intention of removing therefrom, is the domicil.* At least, this definition is better suited to the circumstances of this country."

In *Berry v. Wilcox, supra,* 44 Neb. 82, 62 N.W. 249, the Nebraska Supreme Court stated the test for determining domicile as follows:

"[A person] resides where he has his established home, the place where he is habitually present and to which when he departs he intends to return. The fact that he may at a future time intend to remove will not necessarily defeat his residence before he actually does remove. It is not necessary that he should have the intention of always remaining, but there must coexist the fact and the intention of making it his present abiding place, and there must be no intention of presently removing." *Id.* at 88-89, 62 N.W. at 251.

Applying this test to the following facts, the Court held that it was proper for students to vote in the place where their college was located:

"Now in the case before us these students came to the University Place, their main purpose being to attend the university. They were emancipated from their parents, apparently with no intention of returning to the home of their parents; they regarded University Place as their home, leaving it during vacation and going wherever they could obtain employment, with the intention of returning to University Place at the close of the vacation. They were uncertain as to their course upon graduation and therefore had no particular future residence in view." *Id.* at 89, 62 N.W. at 251.

In *Chomeau v. Roth, supra,* 230 Mo. App. 709, 72 S.W. 2d 997, the Missouri Court of Appeals held that students at a Lutheran seminary were entitled to vote in local elections at the place

where the seminary was located. The Court articulated a test for domicile that was very similar to the general test set out in *Hall*:

> "A temporary removal for the sole purpose of attending school, without any intention of abandoning his usual residence, and with the fixed intention of returning thereto when his purpose has been accomplished, will not constitute such a change of residence as to entitle the student to vote at his temporary abode. But conversely, an actual residence, coupled with the intention to remain either permanently or for an indefinite time, without any fixed or certain purpose to return to the former place of abode, is sufficient to work a change of domicile." *Id.* at 718, 72 S.W. 2d at 999.

Applying this test, however, the Court found that students who entered a seminary with the intent of abandoning their prior home and who intended to remain there only until they completed their education, thereafter to go where their church sent them, were qualified to vote in the seminary community. The Court found a sufficiently indefinite nature in the duration of their stay because of the uncertainty as to exactly how long it would take them to complete their education.

The Restatement Second of Conflict of Laws states the rule as follows:

> "To acquire domicile of choice in a place, a person must intend to make that place his home for the time at least." Restatement Second, Conflict of Laws § 18.

The meaning of this rule is made clear by the following comment, *id.* at 70:

> "There must be a present intention to make a home. One must be able to say, 'This is now my home,' and not, 'This is to be my home.' If there is an intention to make a home at present, the intention is sufficient although the person whose domicile is in question intends to change his home upon the happening of some future event."

The common feature of *Putnam, Berry, Chomeau* and the Restatement position is the care with which they balance the need for certainty in the law of domicile against the interests of a mobile population in being able to call the place they live their

home and in exercising full rights as citizens there. All of them clearly require that in order for a person to establish a new domicile in a place (1) he must have abandoned his prior home and (2) he must have a present intention to make that place his new home. As to the requirement of duration of the intended stay, they diverge semantically but reach the same end result. *Putnam* and *Berry* require only the absence of an intention to leave presently. *Chomeau* retains the "intent to stay indefinitely" test but applies it by recognizing that the exact time at which some future event such as graduation will happen is always uncertain. The Restatement requires only an intention to make that place one's home "for the time at least." No matter how they state it, they all agree that a plan to leave upon the happening of a future event does not preclude one from acquiring domicile. This view was well summarized recently in *Hershkoff v. Board of Registrars*, 366 Mass. 570, 321 N.E. 2d 656 (1974). Plaintiffs there were students denied the right to vote in Worcester, Massachusetts because they did not plan to remain beyond graduation. The Court affirmed an order that they be allowed to register, saying, *id.* at 578, 321 N.E. 2d at 664:

> "As to the intended duration of residence, we have often said that domicil is the place of one's actual residence 'with intention to remain permanently or for an indefinite time and without any certain purpose to return to a former place of abode.' 'Expressions such as these should not be taken literally.' The requisite intention is to make the place one's home for the time at least. If young people have such an intention, even if they intend to move later on, nevertheless 'they have their home in their chosen abode while they remain.' " (Citations omitted.)

We now think the approach of these cases and the Restatement is constitutionally required insofar as the law of domicile relates to the right to vote. *Dunn v. Blumstein, supra,* stated, 405 U.S. at 343-44: "An *appropriately defined,* and *uniformly applied* requirement of bona fide residence may be necessary to preserve the basic conception of a political community, and therefore could meet close constitutional scrutiny." (Emphasis supplied.) Such scrutiny involves a determination whether "the exclusions [from voting] are necessary to promote a compelling state interest." *Kramer v. Union Free School District No. 15, supra,* 395 U.S. at

627. The test of domicile for voting purposes must therefore exclude only those whose exclusion is necessary "to preserve the basic conception of a political community." We think the extent to which a state may limit access to the right to vote by virtue of its law of domicile is as was stated by Judge Friendly writing for a three-judge court in *Ramey v. Rockefeller, supra,* 348 F. Supp. at 788:

> "[T]he only constitutionally permissible test is one which focuses on the individual's present intention and does not require him to pledge allegiance for an indefinite future. *The objective is to determine the place which is the center of the individual's life now, the locus of his primary concern.* The determination must be based on all relevant factors; it is not enough that a student, or any other former non-domiciliary, would find that the place of his presence is more convenient for voting or would enable him to take a more active part in political life. The state may insist on other indicia, including the important one of abandonment of a former home." (Emphasis supplied.)

[10]   We therefore hold that a person has domicile for voting purposes at a place if he (1) has abandoned his prior home (2) has a present intention to make that place his home, and (3) has no intention presently to leave that place. Applying this rule to the more specific case of students we hold that a student is entitled to register to vote at the place where he is attending school if he can show by his declarations and by objective facts that he (1) has abandoned his prior home, (2) has a present intention of making the place where he is attending school his home and (3) intends to remain in the college town at least as long as he is a student there and until he acquires a new domicile.

In dealing with this aspect of the case, we are not inadvertent to the decision of the United States Supreme Court in *Symm v. United States,* 39 CCH S.Ct. Bull., p. B724 (January 15, 1979), *summarily aff'g, United States v. Texas,* 445 F. Supp. 1245 (S.D. Tex. 1978). *Symm* was a suit brought by the United States alleging that Leroy Symm, the Tax Assessor-Collector of Waller County, Texas, had in the course of his duties as chief election registration official of the county denied students at Prairie View A&M University the right to register to vote in violation of the

14th, 15th and 26th Amendments. Also joined as defendants were the State of Texas and Waller County.

The evidence offered in the case showed that Symm required students seeking to register to fill out a detailed questionnaire, set out at 445 F. Supp. 1262-63. He also presumed that all students seeking to register were not residents of Waller County, thus applying a presumption that was declared unconstitutional in *Whatley v. Clark, supra*, 482 F. 2d 1230. Lastly, Symm testified as to the test for domicile he applied, "that generally students are not regarded by him as residents unless they do something to qualify as permanent residents, such as marrying and living with their spouse or obtaining a promise of a job in Waller County when they complete school. He does not regard a dormitory room as a permanent residence, and regards a permanent residence only as a place with a refrigerator, stove and furniture." 445 F. Supp. at 1251.

A three-judge court in the Southern District of Texas found that Symm had engaged in a pattern of conduct that violated the 26th Amendment. The court also found that Symm had violated Texas law in failing to obey a directive of the Secretary of State to cease using the questionnaire. The court then entered a detailed permanent injunction against Symm, prohibiting him from, among other things, using a presumption of nonresidency, requiring students to fill out a special questionnaire, and not registering students "on the same basis and by application of the same standards and procedures, without reference to whether such students have dormitory addresses, whether or not they resided in Waller County prior to attending school, and whether or not they plan to leave Waller County after graduation." No judgments were entered in the case against either the State of Texas or Waller County.

Defendant Symm appealed to the United States Supreme Court. Five of the justices joined in summarily affirming the lower court decision. Justice Rhenquist, joined by Chief Justice Burger, dissented, arguing that the three-judge court did not have jurisdiction to enter a judgment against Symm. Justice Blackmun would have noted probable jurisdiction in the case. Justice Powell would have dismissed the appeal for want of a properly presented federal question.

We do not think the Supreme Court's decision in *Symm* precludes us from approving the use of a questionnaire or from allowing our registrars to apply a presumption of nonresidency in order to place the burden of producing some evidence of residency upon the person seeking to register. The district court in *Symm* disapproved of a pattern of conduct aimed at preventing students from registering to vote. It carefully avoided holding the use of a questionnaire per se unconstitutional, distinguishing its situation from *Ballas v. Symm*, 494 F. 2d 1167 (5th Cir. 1974), which it read as approving the use of a questionnaire in making voter registration determinations so long as it was not used as a device to prevent legal residents from voting. The practices we have approved under the guidelines we have set out are clearly not devices to keep students who are legal residents from voting. They are instead designed to help registrars obtain the necessary facts to determine whether a student is entitled to vote in a particular locality. Lacking a more definite signal to the contrary from the United States Supreme Court, we hold that their use is permissible.

V

Finally, we touch briefly on applicant intervenors' motion to intervene and on the relief available at trial on remand. Applicant intervenors are, or were, students registered to vote in Orange County or holders of or candidates for public office in Orange County. They argue that they were entitled to intervene in the action as of right under G.S. 1A-1, Rule 24(a) or, alternatively, that they should have been permitted to intervene under Rule 24(b). We do not pass on the merits of their arguments. Because of the nature of our decision here, especially as regards the illegality of an order purging students from the voting rolls, the matters in controversy at the trial on remand will differ significantly from their apparent posture at the time Judge Bailey ruled on their motion. We therefore think it appropriate simply to vacate his order and allow applicant intervenors, if they desire, to resubmit their motion at subsequent proceedings below.

[11] On remand if evidence adduced at trial shows that the members and officials of the Orange County Board have failed to require students seeking to register to vote to prove their domicile to be in Orange County, the court may enjoin them from

further registering students without doing so. Although the court also has the power to order the Orange County Board to use a specific set of questions in connection with registering students to vote, the court should use caution in the exercise of this power.

Plaintiffs have asked for both a writ of mandamus and a mandatory injunction against the Orange County Board. The writ of mandamus is an ancient and carefully circumscribed extraordinary remedy. Normally, it will not lie to control the manner of performance of a public official's duties. Ferris & Ferris, Extraordinary Legal Remedies § 208 (1926). For this treason, we doubt that use of a specific set of questions could be required by a writ of mandamus.[8] Moreover, a suit for a mandatory injunction against a public official is practically identical to a request for a writ of mandamus. *Sutton v. Figgatt*, 280 N.C. 89, 185 S.E. 2d 97 (1971); *Carroll v. Board of Trade*, 259 N.C. 692, 131 S.E. 2d 483 (1963); *Hospital v. Wilmington*, 235 N.C. 597, 70 S.E. 2d 833 (1952). Here, however, there is a difference between them. If the evidence shows that registration officials have consistently failed to comply with the law in the past and that unless they are required to use a particular set of questions there is reasonable certainty they will continue to do so, then the court may in the exercise of its inherent equitable powers require them to do so.

Even so the court should be aware of its own limitations. As was said by another court when confronted with this same issue:

"It is doubtful that any court has the wisdom to compose a list of questions which could be used by a registration board in determining every issue of residency that might be presented." *Dyer v. Huff, supra*, 382 F. Supp. at 1316.

If a list of questions seems necessary, we suggest that the better practice would be to draw on the expertise of the Orange County Board to prepare a list for submission to and approval by the court.

In order to assist the trial court on remand and for the guidance of local boards of elections, we summarize the aspects of

8. *Hall* did not require the use of a particular set of questions. It suggested a number of appropriate inquiries that might be made. Normally, it will be better to keep the inquiry flexible so that the circumstances of each individual's case can be carefully considered. There is no legal duty to formulate and use a particular questionnaire. Mandamus is available only when there is a clear legal right to the remedy. *Snow v. Board of Architecture, supra*, 273 N.C. 559, 160 S.E. 2d 719.

our opinion dealing with the registration of student voters as follows:

1. A student's residence for voting purposes is a question of fact dependent upon the circumstances of each individual's case. There is no permissible manner for making group determinations of residence.

2. A person is a resident of a place for voting purposes if he (1) has abandoned his prior home, (2) has a present intention to make that place his home, and (3) has no intention presently to leave that place. Applying this test to a student, he may vote in a college town if he (1) has abandoned his prior home, (2) has a present intention of making the college town his home, and (3) intends to remain in the college town at least as long as he is a student there and until he acquires a new domicile.

3. In order to determine whether in fact a student has abandoned his prior home and presently intends to make the college town his home and intends to remain in the college town at least as long as he is a student there, a registrar should make inquiry of students more searching and extensive than may generally be necessary with respect to other residents. The kind of questions that should be asked are generally set out in *Hall*. A registrar is not limited, of course, to these questions. One that should be asked of all persons seeking to register is "Are you now registered to vote, and, if so, where?" A registrar is not bound by a student's mere statements as to his intent, no more than he is bound by the statements of anyone seeking to register to vote. According to G.S. 163-72:

> "After being sworn, the applicant shall state as accurately as possible his name, age, place of birth, place of residence, political party affiliation, if any, under the provisions of G.S. 163-74, the name of any municipalities in which he resides, and any other information which may be material to a determination of his identity and qualification to be admitted to registration. The applicant shall also present to the registrar written or documentary evidence that he is the person he represents himself to be. *The registrar, if in doubt as to the right of the applicant to register, may require other evidence satisfactory to him as to the applicant's qualifications.*" (Emphasis supplied.)

If necessary to ensure that registrars comply with the law and make the necessary inquiries a court may order that these inquiries be in the form of a questionnaire to be devised by the court or by the county board of elections under the court's supervision.

4. There is a rebuttable presumption that a student who leaves his parents' home to go to college is not a resident for voting purposes of the place where the college is located. The effect of this presumption is to place the burden of going forward with some proof of residence on a student seeking to register to vote. As with other persons the student has the burden of persuasion on the issue.

Except for that portion of the order below dismissing the action against the State Board, which we affirm, the order of the trial court is vacated and the case remanded for further proceedings not inconsistent with this opinion.

Affirmed in part; vacated in part; remanded.

Justices BRITT and BROCK did not participate in the consideration or decision of this case.