IN THE SUPREME COURT OF NORTH CAROLINA

No. 55A23

Filed 28 June 2024

JOSEPH ASKEW, CHARLIE GORDON WADE III, and CURTIS WASHINGTON

v.

CITY OF KINSTON, a municipal corporation

On appeal of right of a substantial constitutional question pursuant to N.C.G.S. § 7A-30(1) of a unanimous decision of the Court of Appeals, 287 N.C. App. 222 (2022), vacating an order of summary judgment entered on 29 September 2021 by Judge Joshua Willey in Superior Court, Lenoir County, and remanding the case. Heard in the Supreme Court on 9 April 2024.

*Ralph T. Bryant, Jr., for plaintiffs-appellants.*

*Hartzog Law Group LLP, by Dan M. Hartzog Jr. and Katherine Barber-Jones, for defendant-appellee.*

EARLS, Justice.

In *Corum v. Univ. of N.C.*, 330 N.C. 761, 783 (1992), this Court "recognized a direct action under the State Constitution against state officials for violation of rights guaranteed by the Declaration of Rights." The question in this case is whether plaintiffs bringing *Corum* claims must exhaust administrative remedies before entering the courthouse doors. The Court of Appeals said yes. Linking administrative exhaustion to subject-matter jurisdiction, it held that a court cannot hear a *Corum* suit unless the plaintiff first depleted all agency relief. *Askew v. City of Kinston*, 287

N.C. App. 222, 230 (2022).

We reject that approach. Exhaustion of administrative remedies does not dictate jurisdiction over *Corum* claims. That authority flows from the Constitution itself. *See Corum*, 330 N.C. at 784. To ensure that North Carolinians "may seek to redress all constitutional violations," *Corum* creates a unique path into court when existing channels fail to offer an adequate remedy. *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 342 (2009).

The prospect of agency relief goes to an element of a *Corum* cause of action: that the plaintiff lacks meaningful redress through "established claims and remedies." *Corum*, 330 N.C. at 784; *see also Washington v. Cline*, 898 S.E.2d 667, 671 (N.C. 2024). That issue is substantive rather than jurisdictional—it focuses on whether *Corum* is the right vehicle for a claim, not a court's power to act on it. In *Corum* cases like this one, the question is whether the review and relief afforded by the administrative process is an effective stand-in for a direct constitutional suit. *See id.* Because the Court of Appeals substituted that case-by-case inquiry with a blanket jurisdictional mandate, we vacate and remand.

## I.    Background

### A. Kinston Crafts a Large-Scale Condemnation Plan

Plaintiffs Joseph Askew and Curtis Washington[1] live and own property in the

---

[1] At the start of this litigation, a third plaintiff—Gordon Wade III—joined Mr. Askew and Mr. Washington in filing the complaint. Mr. Wade, however, voluntarily dismissed his claims without prejudice before the trial court granted summary judgment for Kinston.

City of Kinston (Kinston). Plaintiffs are African American, and they allege that their lots are in predominately African American neighborhoods. In 2017, Kinston condemned two of Mr. Askew's properties and one of Mr. Washington's. Soon after, it slated those properties for demolition.

Those condemnations were not isolated decisions—they were part of Kinston's renewed efforts to remove blighted buildings. In the early 2010s, Kinston began razing "condemned, unsafe properties." For several years, those properties were "identified one-by-one" and "[d]emolitions proceeded when necessary." Starting in 2017, however, Kinston adopted "a more targeted approach to improve the appearance of neighborhoods." It ramped up its efforts to "condemn[ ] and demolish[ ] dilapidated, blighted houses and commercial buildings." And that same year, it upped demolition funding by 150%.

To make wise use of those new funds, Kinston's planning department chose 150 properties "that met the criteria for condemnation" under "applicable statutes and building code provisions." The City narrowed that list to a "Top 50" to prioritize for condemnation. According to Kinston, it chose those "Top 50" properties based on factors like dilapidation and closeness to "a heavily travelled road." The City also used a technique called clustering—sites in "proximity to other qualifying" buildings were grouped together as "part of a 'cluster' of dilapidated properties." Identifying and focusing on "clusters" ensured that "buildings close together were condemned" and made "eligible for demolition around the same time." As an added measure,

Kinston asked its police department to "identify[ ] buildings [that] were especially problematic."

Later that year, the Kinston City Council met to review the "Top 50" list and the criteria used to create it. During the meeting, council members "confirmed that houses would be clustered to cut down on cost where possible." Adam Short, Kinston's planning director, pointed the council to clusters in specific areas that were candidates for large-scale condemnations. For instance, he flagged a grouping of lots on Tower Hill Road as a "great starting point for clustering." That area, Mr. Short conceded in deposition, "is predominantly African American." The council, with minor revisions, approved the selection criteria and finalized the "Top 50" list. With that blessing, Kinston moved forward with condemning and demolishing the "Top 50" properties.

## B. Plaintiffs Assert Racial Discrimination in Kinston's Condemnation Selections

Plaintiffs offer a different perspective on Kinston's condemnation scheme. In their view, the City engaged in the "systematic destruction of African American buildings" by using "the process for demolishing dilapidated properties in a racial[ly] discriminatory manner." They allege that Kinston singled out "buildings that are owned by African Americans or buildings that exist in the African American neighborhoods." At the same time, they continue, Kinston ignored "buildings that are in similar or worse state[s] of disrepair[ ] that have Caucasian property owners" and are located "in the neighborhoods with predominately Caucasian residents."

Plaintiffs assert, for instance, that the City "has targeted the east side of Kinston where African Americans primarily live." But in "primarily Caucasian" areas—such as "Mitchell Town, a historic district . . . on the west side of Kinston"—"very few or any buildings are being demolished." Though the City has funds to repair and preserve historic properties, plaintiffs contend that it "distribute[s] those funds in a racially disproportionate manner." In their view, Kinston reserves those funds for "historic buildings" in "predominately Caucasian neighborhoods, while systematically destroying and denying the same financial assistance to African American residents."

Plaintiffs argue that the City's "actionable double standard" was a conscious scheme made possible by its "arbitrary selection process." They allege that Kinston "has no guidelines" for selecting properties to condemn and demolish. Instead, plaintiffs contend, the City makes "arbitrary decisions" about which properties are chosen for demolition, which ones are actually demolished, and when those demolitions move forward. From plaintiffs' perspective, the City selected sites for demolition that do not fit any standardized criteria. It has "removed properties from the list of demolition without following any guidelines." According to plaintiffs, then, Kinston did not pick "which buildings would be demolished based on the condition of, or degree of disrepair of the buildings." And guidelines proffered by the City were, plaintiffs assert, crafted "to specifically justify the decision to target the African American buildings in Kinston for demolition."

In short, plaintiffs urge that Kinston has weaponized "a local blight ordinance to target low-income African American Kinston residents, so the [C]ity can take their property and resell it to high-end developers without paying compensation to the African American owners." And when Kinston placed plaintiffs' properties on the demolition list, they allege, it did so because of their race.

## C. Kinston's Process for Condemning Properties and the Administrative Relief Available to Property Owners

Kinston asserts that it relied on then-existing blight statutes to condemn the chosen properties—including plaintiffs'—and schedule them for demolition.[2] Those provisions allowed the City's building inspectors to condemn a structure as "especially dangerous to life because of its liability to fire or because of bad condition of walls, overloaded floors, defective construction, decay, unsafe wiring or heating system, inadequate means of egress, or other causes." N.C.G.S. § 160A-426(a) (2019) (repealed 2019). An inspector must post a notice in a "conspicuous place" on the building. N.C.G.S. § 160A-426(c) (2019) (repealed 2019). That notice, in turn, must specify the structure's dangerous condition. N.C.G.S. § 160A-428 (2019) (repealed 2019).

---

[2] In 2019, the General Assembly repealed Article 19 of Chapter 160A of the General Statutes and added Chapter 160D. *See* An Act to Clarify, Consolidate, and Reorganize the Land-Use Regulatory Laws of the State, S.L. 2019-111, §§ 2.1(a), 2.3, 2019 N.C. Sess. Laws 424, 439. However, Article 19 of Chapter 160A remained in effect during the events relevant to the claims in this case. *Id.* § 3.2, 2019 N.C. Sess. Laws at 547 ("[B]ecomes effective on January 1, 2021, and applies to local government development regulation decisions made on or after that date.").

It need also alert the property's owner of a hearing before the inspector. *Id.* During that hearing, the owner is "entitled to be heard in person or by counsel," and may "present arguments and evidence" against condemnation. *Id.* The inspector may then order the owner to "remedy the defective conditions by repairing, closing, vacating, or demolishing" the structure, or by "taking other necessary steps" to fix the problem. N.C.G.S. § 160A-429 (2019) (repealed 2019).

An administrative process allows property owners to challenge a condemnation decision. Within ten days of the inspector's written order, an owner may appeal it to the city council. N.C.G.S. § 160A-430 (2019) (repealed 2019). The council, in turn, reviews the inspector's decision and—after hearing from the owner—may "affirm, modify and affirm, or revoke the order." *Id.* The owner may then challenge the council's decision by petitioning the superior court for writ of certiorari. N.C.G.S. § 160A-393(f) (2019) (repealed 2019).

On review, the superior court examines whether the challenged order is "[i]n violation of constitutional provisions," "[a]rbitrary or capricious," or "[a]ffected by other error of law." N.C.G.S. § 160A-393(k)(1) (2019) (repealed 2019). It makes that decision based on the record, statutorily defined as the documents, exhibits, and other materials submitted to the city council. N.C.G.S. § 160A-393(i) (2019) (repealed 2019). But if the court deems the record "not adequate to allow an appropriate determination" of the legal merits, it may supplement the record with affidavits, witness testimony, or documentary and other evidence as needed. N.C.G.S. § 160A-

393(j) (2019) (repealed 2019).

After examining a condemnation order, the superior court may affirm the council's decision, reverse it and remand the case with instructions, or remand the case for further proceedings. N.C.G.S. § 160A-393(l) (2019) (repealed 2019). If, for instance, the court finds that a condemnation was "based upon an error of law," it may "remand the case with an order that directs the decision-making board to take whatever action should have been taken had the error not been committed or to take such other action as is necessary to correct the error." N.C.G.S. § 160A-393(l)(3) (repealed 2019). Ancillary injunctive relief is also available—the court may enjoin a "party to th[e] proceeding to take certain action or refrain from taking action that is consistent with the court's decision on the merits of the appeal." N.C.G.S. § 160A-393(m) (2019) (repealed 2019).

## D. Kinston Condemns Plaintiffs' Properties

In late November 2017, Kinston condemned two of Mr. Askew's properties citing fire hazards, decay, structural problems, and unsafe wiring. After a hearing, the building inspector issued orders to abate and directed Mr. Askew to "remedy the defective conditions" by repairing or demolishing the buildings within set timeframes. Mr. Askew appealed neither order.

City inspectors revisited the sites at the agreed-upon intervals. For the first property, they saw no "observable improvement to the condition" and so recommended "[m]oving forward with the condemnation process." Mr. Askew sought

a hearing from the Kinston City Council and appeared at a meeting in January 2019. The council upheld the condemnation order. Mr. Askew never petitioned the superior court for writ of certiorari, as allowed by statute.

For Mr. Askew's second property, city inspectors visited the lot and noted improvements. As requested, they gave Mr. Askew more time to continue repairs. But when inspectors returned to the site the next year, they elected to condemn it because Mr. Askew had "failed to stabilize the structure or protect the building from water damage that continues to cause rot and decay."

In 2018, Kinston condemned Mr. Washington's property citing fire hazards, decay, structural problems, and a collapsing roof. The building inspector issued an abatement order, but Mr. Washington did not appeal it to the Kinston City Council or superior court.

In 2019, Mr. Askew and Mr. Washington jointly sued Kinston in federal court, alleging "violations of their [Fourteenth] amendment, substantial due process, equal protection rights, discrimination, disparity and condemnation of a historical home." *Askew v. City of Kinston*, No. 4:19-CV-13-D, 2019 WL 2126690, at *1 (E.D.N.C. May 15, 2019) (alteration in original). A federal district court dismissed the complaint for lack of subject-matter jurisdiction. *Id.* at *4.

**E. Plaintiffs Bring *Corum* Claims Against Kinston**

Mr. Askew and Mr. Washington then filed *Corum* claims against Kinston in the Superior Court, Lenoir County. According to plaintiffs, the City's discriminatory

and arbitrary decisions violated the equal protection and due process guarantees of North Carolina's Constitution. That meant, plaintiffs continued, that the administrative process could not offer an "adequate remedy at state law." For Kinston's constitutional breaches, plaintiffs sought a declaratory judgment, injunctive relief, and damages over $25,000.

In its answer, Kinston generally denied the complaint's allegation. It later moved for summary judgment, arguing that plaintiffs failed to exhaust administrative remedies. The superior court granted summary judgment for Kinston on all claims. Mr. Askew and Mr. Washington appealed.

## F. The Court of Appeals Rules Against Plaintiffs on Jurisdictional Grounds

The Court of Appeals also dispensed with plaintiffs' claims. *See Askew*, 287 N.C. App. at 229–30. But rather than examine the summary judgment ruling, the Court of Appeals focused on jurisdiction. *See id.* at 229. This Court has explained:

> As a general rule, where the legislature has provided by statute an effective administrative remedy, that remedy is exclusive and its relief must be exhausted before recourse may be had to the courts. This is especially true where a statute establishes . . . a procedure whereby matters of regulation and control are first addressed by commissions or agencies particularly qualified for the purpose.

*Presnell v. Pell*, 298 N.C. 715, 721 (1979) (citations omitted). The Court of Appeals imported that exhaustion requirement into the framework for *Corum* claims. *See Askew*, 287 N.C. App. at 229–30. It held, in essence, that a court cannot hear a direct constitutional suit unless the plaintiff depletes all avenues of administrative relief.

*See id.*

In the court's view, plaintiffs "primarily seek to enjoin [Kinston] from demolishing [their] properties." *Id.* at 229. They did "not allege that exhaustion would be futile." *Id.* And since the administrative process allows "the city council and the superior court to review [p]laintiffs' injuries and grant the relief [they] seek," the court reasoned, they "are not excused from exhausting their administrative remedies." *Id.* Because plaintiffs bypassed the administrative scheme before raising their *Corum* claims, the court explained, their failure to exhaust administrative relief deprived the trial court of jurisdiction. *Id.* at 230. The Court of Appeals thus directed the trial court to dismiss plaintiffs' *Corum* claims without prejudice for lack of subject-matter jurisdiction. *Id.*

## II. Analysis

The Court of Appeals' analysis was doubly flawed. It failed to disaggregate and examine plaintiffs' distinct constitutional claims. On top of that, the court tied administrative exhaustion to subject-matter jurisdiction over *Corum* suits, transplanting the rules for run-of-the-mill agency disputes into *Corum*'s unique framework.

### A. Plaintiffs' Discrete *Corum* Claims

*Corum* embodies a "time-honored" legal principle: "[W]here there is a right, there must be a remedy." *See Washington*, 898 S.E.2d at 668–69 (cleaned up). To "ensure that every right does indeed have a remedy in our court system," *id., Corum*

offers a common law cause of action when existing relief does not sufficiently redress "a violation of a *particular* constitutional right," *Corum*, 330 N.C. at 784 (emphasis added). Our post-*Corum* cases have elaborated on that point, explaining that "an adequate remedy is one that meaningfully addresses the constitutional violation, even if the plaintiff might prefer a different form of relief." *See Washington*, 898 S.E.2d at 671; *see also id.* at 672 (explaining that *Corum* "applies when one's rights are violated, and the law offers either no remedy or a remedy that is meaningless").

The "power to fashion an appropriate remedy" turns on "the right violated and the facts of the particular case." *Simeon v. Hardin*, 339 N.C. 358, 373 (1994) (quoting *Corum*, 330 N.C. at 784). That is because different rights "protect persons from injuries to particular interests." *Carey v. Piphus*, 435 U.S. 247, 254 (1978). And so "[v]arious rights" in various contexts may "require greater or lesser relief to rectify" their breach. *Corum*, 330 N.C. at 784; *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) ("[E]very right, when withheld, must have a remedy, and every injury its proper redress." (cleaned up)).

Across our *Corum* precedent, then, we have parsed the different constitutional injuries—and thus the different modes of relief—at play when the state infringes the "[v]arious rights" protected by our Constitution. *See Corum,* 330 N.C. at 782 (free speech); *Copper v. Denlinger*, 363 N.C. 784, 788 (2010) (procedural due process); *Deminski v. State Bd. of Educ.*, 377 N.C. 406, 413 (2021) (opportunity to receive a sound basic education); *Tully v. City of Wilmington*, 370 N.C. 527, 535 (2018) (pursuit

of "one's profession free from unreasonable governmental action"); *Washington*, 898 S.E.2d at 672 (speedy trial).

If a plaintiff brings distinct *Corum* actions for the violation of distinct constitutional rights, courts may not lump those claims together. That cookie-cutter approach to rights and remedies strays from *Corum*'s flexible inquiry. As a legal and logical matter, the scope and nature of the constitutional wrong dictate whether existing modes of redress "apply to the facts alleged" or "provide for the type of remedy sought." *Craig*, 363 N.C. at 340, 342. To thus accord "every injury its proper redress," *Washington*, 898 S.E.2d at 670 (quoting *Marbury*, 5 U.S. (1 Cranch) at 163), *Corum* requires courts to disaggregate "the right[s] violated," the constitutional harms alleged, and the "appropriate remedy" on "the facts of the particular case," *Simeon*, 339 N.C. at 373 (quoting *Corum*, 330 N.C. at 784).

The Court of Appeals, however, collapsed plaintiffs' claims into a monolith without examining the contours, injuries, and theories underpinning each. Plaintiffs brought two *Corum* suits—one based on substantive due process, the other on equal protection. Both are rooted in Article I, Section 19, often called the Law of the Land Clause. In full, that provision reads:

> No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

N.C. Const., art. I, § 19. Despite their shared constitutional origins, plaintiffs' *Corum* claims assert different rights, raise different injuries, and envision different modes of relief.

Substantive due process "is a guaranty against arbitrary legislation, demanding that the law be substantially related to the valid object sought to be obtained." *Lowe v. Tarble*, 313 N.C. 460, 461 (1985). In essence, it guards against unreasonable government actions that deprive people of life, liberty, or property. *See Halikierra Cmty. Servs. LLC v. N.C. Dep't of Health & Hum. Servs.*, 898 S.E.2d 685, 689 (N.C. 2024). Invoking that guarantee, plaintiffs contend that Kinston's decisions to condemn and demolish their properties were "unreasonable, arbitrary or capricious." *See State v. Joyner*, 286 N.C. 366, 371 (1975). For their substantive due process claim, then, plaintiffs' alleged constitutional injury is the "arbitrary and unduly discriminatory interference" with their rights as property owners. *See In re Ellis*, 277 N.C. 419, 424 (1970). If their argument holds, plaintiffs can remedy that harm by stopping the City from following through on its condemnation orders and demolishing their lots.

But plaintiffs advance another *Corum* claim—an equal protection challenge to Kinston's condemnation scheme. They argue that the City chose properties based on race—that it singled out black-owned properties in majority-black neighborhoods, while ignoring similarly dilapidated white-owned homes in predominately white neighborhoods. That racially disparate treatment, plaintiffs urge, violates the Equal

Protection Clause, which "guarantees equal treatment of those who are similarly situated." *Grace Baptist Church v. City of Oxford*, 320 N.C. 439, 447 (1987) (cleaned up).

For plaintiffs' equal protection claim, then, the constitutional violation is Kinston's alleged discrimination based on race. That harm springs from plaintiffs' right to evenhanded treatment from the government. Plaintiffs' ultimate complaint, in other words, is not about what happens to their land but the alleged racial targeting that tainted the proceedings from the start. *Cf. Shaw v. Reno*, 509 U.S. 630, 641, 643 (1993) ("An understanding of the nature of appellants' claim is critical to our resolution of the case . . . Classifications of citizens solely on the basis of race are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." (cleaned up)); *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (explaining that discrimination harms "persons who are personally denied equal treatment" by "perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community" (cleaned up)).

If plaintiffs carry the day, their equal protection claim contemplates a distinct form of relief—equal treatment from Kinston, not a specific outcome as to their properties. Said differently, this claim focuses on the journey—how the City chose properties—rather than the destination—whether Kinston may ultimately condemn and demolish plaintiffs' lots. When "the right invoked is that to equal treatment, the

appropriate remedy is a *mandate* of equal treatment." *See id.* at 740; *cf. State v. Cofield*, 320 N.C. 297, 309 (1987) (invoking Equal Protection Clause to set aside conviction based on racial discrimination in grand jury selection but allowing the State to reindict defendant through nondiscriminatory procedures). For instance, if plaintiffs come forward with enough evidence to prove that Kinston chose properties using impermissible race-based criteria in violation of the Equal Protection Clause, the appropriate remedy would be to prohibit the City from engaging in race-based discrimination. Even then, plaintiffs' properties might ultimately be selected for condemnation using race-neutral criteria. *See S. S. Kresge Co. v. Davis*, 277 N.C. 654, 663 (1971) (holding that a city violated Equal Protection Clause by selectively enforcing ordinance and awarding plaintiffs injunction "so long as [city officials] continue the discriminatory practices" but limiting relief so that the city could "inaugurat[e] and carry[ ] out a nondiscriminatory enforcement policy and program"). But merely stopping Kinston from demolishing plaintiffs' specific lots would not fix the asserted racial targeting that undergirded the City's condemnation plan. In other words, no administrative decision would redress the alleged race-based discrimination at the threshold.

The Court of Appeals grasped one of plaintiffs' *Corum* claims. It squarely addressed their substantive due process challenge to Kinston's demolition of their individual properties. But the court overlooked plaintiffs' equal protection suit and the contours of that asserted right. It recast the constitutional harm as the mere

condemnation of plaintiffs' land and the resulting interference with their property rights. *See Askew*, 287 N.C. App. at 229. So framed, the proper relief for that injury, the court continued, is "to enjoin [Kinston] from demolishing [p]laintiffs' properties." *Id.* And if plaintiffs' constitutional injuries are reduced to disputes about their individual lots, the administrative process seems suited to the task. The Court of Appeals thought so. In its view, the administrative remedy allowed "the city council and the superior court to review [p]laintiffs' injuries and grant the relief [they] seek"—i.e., quashing the condemnation orders for their properties and stopping Kinston's demolitions. *Id.*

But though that summation may fairly characterize plaintiffs' substantive due process claim, it sidesteps their equal protection challenge. For the latter, plaintiffs assert a different injury—Kinston's alleged racial discrimination—which requires a different species of relief—a "*mandate* of equal treatment." *See Heckler*, 465 U.S. at 740. According to plaintiffs, then, the administrative process is miscalibrated for their equal protection claims. It can only halt the condemnation of atomized parcels, they contend, not strike at Kinston's alleged systemic discrimination. Plaintiffs thus urge that forcing them to exhaust administrative channels would only prolong the inequality they assert.

We leave the merits of those arguments for remand. But methodologically, plaintiffs' challenges to the administrative process highlight the missteps in the opinion below. By treating plaintiffs' separate constitutional claims as the same, the

Court of Appeals dislocated the *Corum* analysis from the discrete "right[s] violated and the facts of the particular case." *Simeon*, 339 N.C. at 373 (quoting *Corum*, 330 N.C. at 784).

## B. Subject-Matter Jurisdiction

A second flaw built on the first. The Court of Appeals tied administrative exhaustion to subject-matter jurisdiction over direct constitutional suits, holding that a court's power to hear *Corum* claims hinges on whether the plaintiff first depleted administrative relief. That was error. In so holding, the Court of Appeals drew from a distinct class of cases—those dealing with routine administrative grievances reviewable through statutory channels. But the rules for garden variety agency disputes cannot be unflinchingly transplanted into the universe of *Corum*.

We start with first principles. Subject-matter jurisdiction is a court's "power to pass on the merits of a case." *Slattery v. Appy City, LLC*, 898 S.E.2d 700, 704 (N.C. 2024) (cleaned up). It is "conferred by the Constitution, statutes and the law of the land, that is, by sovereign authority." *Stafford v. Gallops*, 123 N.C. 19, 22 (1898). Subject-matter jurisdiction is also "fundamental." *Henderson County v. Smyth*, 216 N.C. 421, 424 (1939). In "its absence a court has no power to act." *In re T.R.P.*, 360 N.C. 588, 590 (2006).

As we have explained, the "allegations of a complaint determine a court's jurisdiction over the subject matter of the action." *In re K.J.L.*, 363 N.C. 343, 345 (2009). Because the "nature of the case and the type of relief sought" differ between

administrative disputes and *Corum* claims, a court's jurisdiction over those matters is triggered by different allegations and governed by different rules. *See In re T.R.P.*, 360 N.C. at 590 (cleaned up).

### 1. *Subject-Matter Jurisdiction in Administrative Law*

In the administrative realm, jurisdiction over agency disputes turns on whether a party channeled their claim through prescribed administrative avenues. *See Presnell,* 298 N.C. at 722. If the legislature has "explicitly provided" a vehicle to "seek effective judicial review of [a] particular administrative action," *id.* at 722, that "relief must be exhausted before recourse may be had to the courts," *id.* at 721. That rule serves pragmatic aims. *See Elmore v. Lanier*, 270 N.C. 674, 678 (1967). It recognizes that an agency is well-suited to resolve and review "matters it customarily handles, and can apply distinctive knowledge to." *Axon Enter. v. FTC*, 143 S. Ct. 890, 901 (2023). And it fosters efficient and informed decision-making, giving the "entity most concerned with a particular matter the first chance to discover and rectify error," gather facts, and decide matters within its specialized domain. *Presnell*, 298 N.C. at 721.

A court's power to review administrative decisions is—like agencies themselves—an "artificial creature of statute." *High Rock Lake Partners, LLC v. N.C. Dep't. of Transp.*, 366 N.C. 315, 318–19 (2012) (cleaned up). When "jurisdiction is statutory and the [l]egislature requires the [c]ourt to exercise its jurisdiction in a certain manner, to follow a certain procedure, or otherwise subjects the [c]ourt to

certain limitations, an act of the [c]ourt beyond these limits is in excess of its jurisdiction." *In re T.R.P.*, 360 N.C. at 590 (cleaned up). In those cases, the "procedures established by law for the determination of juridical disputes" are like ships, "fashioned by lawmakers to carry legal controversies into judicial ports for decision." *See Brissie v. Craig*, 232 N.C. 701, 707 (1950). Litigants who deviate from statutorily prescribed routes will end up "shipwrecked on procedural reefs." *Id.*

To avoid those treacherous shoals, parties challenging administrative matters must adhere to statutory criteria as a "condition[ ] precedent to obtaining a review by the courts." *In re State ex rel. Emp. Sec. Comm'n*, 234 N.C. 651, 653 (1951); *cf. In re T.R.P.*, 360 N.C. at 590 (noting that pleading requirements for "certain causes of action created by statute" are "not a matter of form, but substance, and a defect therein is jurisdictional" (cleaned up)). Said differently, courts may examine agency disputes within legislative parameters, or not at all. *See id.* Administrative exhaustion—if statutorily required and "followed by effective judicial review"—thus "acquires the status of a jurisdictional prerequisite." *Presnell*, 298 N.C. at 722. Courts may hear such claims only after plaintiffs deplete "their available administrative remedies or demonstrate[ ] that doing so would [be] futile." *See Abrons Fam. Prac. & Urgent Care, PA v. N.C. Dep't of Health & Hum. Servs.*, 370 N.C. 443, 453 (2018).

### 2. *Subject-Matter Jurisdiction Over* Corum *Claims*

But agencies are not courts. *See Ocean Hill Joint Venture v. N.C. Dep't of Env't, Health & Nat. Res.*, 333 N.C. 318, 321 (1993). And *Corum* claims are not

administrative grievances. While subject-matter jurisdiction over administrative matters is legislatively devised and statutorily defined, the judiciary's power to hear *Corum* claims flows from the "authority granted to it by the Constitution." *See Henderson County*, 216 N.C. at 423. That is, in part, because our "Constitution opens the courthouse doors to all who suffer injury." *Fearrington v. City of Greenville*, No. 89PA22, slip op. at 10 (N.C. May. 23, 2024). It also enshrines a "foundational principle of every common law legal system"—that "[w]here there is a right, there is a remedy." *Washington*, 898 S.E.2d at 668 (citing N.C. Const. art. I, § 18). Because it is "the state judiciary that has the responsibility to protect the state constitutional rights of the citizens," *Corum*, 330 N.C. at 783, the power to hear and redress constitutional violations is "conferred by the Constitution," *Stafford*, 123 N.C. at 22; *see also Meads v. N.C. Dep't of Agric.*, 349 N.C. 656, 670 (1998) ("[I]t is the province of the judiciary to make constitutional determinations . . . ."); *Hoke Cnty. Bd. of Educ. v. State*, 358 N.C. 605, 642 (2004) ("[W]hen the State fails to live up to its constitutional duties, a court is empowered to order the deficiency remedied . . . .").

A complaint thus activates a court's subject-matter jurisdiction if it alleges the "infringement of a legal right" secured by the Constitution and presents a justiciable controversy. *See Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 608 (2021). Said another way, a court has jurisdiction if "the right of [plaintiffs] to recover under their complaint will be sustained if the Constitution" is "given one construction and will be defeated" if "given another." *See Steel Co. v. Citizens for a*

*Better Env't,* 523 U.S. 83, 89 (1998) (quoting *Bell v. Hood*, 327 U.S. 678, 685 (1946)); *cf. Bell*, 327 U.S. at 681–82 ("[W]here the complaint, as here, is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions later noted, must entertain the suit.").

The Court of Appeals, however, appeared to conflate two concepts: jurisdiction versus a cause of action. The difference between those is key. Jurisdiction concerns a court's authority to hear and decide a case. *See Slattery*, 898 S.E.2d at 704. A cause of action, on the other hand, is the set of facts or allegations that create a legal right to sue. *See Cause of Action, Black's Law Dictionary* (11th ed. 2019) (defining "cause of action" as "[a] group of operative facts giving rise to one or more bases for suing"). It captures the theory on which a plaintiff builds their suit, pointing to the wrong done and the remedy sought. In specific cases, *Corum* provides a "direct cause of action under the State Constitution," allowing a plaintiff to raise and redress a constitutional violation when existing mechanisms fall short. *Corum*, 330 N.C. at 786.

As a unique species of common law suit, *Corum* claims depend on the Constitution for both substance and a vehicle into court. They are born of necessity, taking root in the interstices between rights and remedies. *Corum* grounded its precepts in a simple truth: the "very purpose of the Declaration of Rights is to ensure that the violation of these rights is never permitted by anyone who might be invested under the Constitution with the powers of the State." *Id.* at 783. Our Constitution thus secures the people's "rights against state officials and shifting political

majorities." *Id.* at 787. It also tasks the courts with the "responsibility to guard and protect" constitutional guarantees. *Id.* at 785. To fulfill their duty and "ensure that every right does indeed have a remedy in our court system," *Washington*, 898 S.E.2d at 668, courts may draw on their "inherent constitutional power to fashion a common law remedy for a violation of a particular constitutional right," *Corum*, 330 N.C. at 784. Thus, *Corum*'s promise: "[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution." *Id.* at 782.

But *Corum* also recognized the prudential and structural parameters of that "extraordinary" authority. *Id.* at 784. It thus set two "critical limitations" on direct constitutional suits. *Id.* Courts must "bow to established claims and remedies" when adequate. *Id.*; *see also In re Alamance Cnty. Court Facilities*, 329 N.C. 84, 101 (1991) (urging judicial respect of existing "statutory remedies and constraints when the[y] do not stand in the way of obtaining what is reasonably necessary for the proper administration of justice"). And courts must minimize inter-branch friction by crafting the "least intrusive remedy available and necessary to right the wrong." *Corum*, 330 N.C. at 784; *see also In re Alamance Cnty.*, 329 N.C. at 99 (cautioning that the use of inherent powers "must be no more forceful or invasive than the exigency of the circumstances requires"). *Corum* thus furnishes a court-created claim in specific circumstances: when existing channels do not adequately redress "a violation of a particular constitutional right." *Corum*, 330 N.C. at 784; *see also In re*

*Alamance Cnty.*, 329 N.C. at 100 (reserving inherent powers for cases where "other means to rectify" the problem "are unavailable or ineffectual").

Consistent with those limits, the inadequacy of "established claims and remedies" is an element of a *Corum* cause of action. *Corum*, 330 N.C. at 784; *see also Deminski,* 377 N.C. at 413. It marks the conditions in which the judiciary will step into the breach and fashion a vehicle for a plaintiff to "have the merits of his case heard and his injury redressed if successful." *Craig*, 363 N.C. at 341. And it "ensures that an adequate remedy must provide the possibility of relief under the circumstances." *Id.* at 340. As part of a *Corum* cause of action, then, the sufficiency of existing relief—including administrative remedies—does not dictate subject-matter jurisdiction. *See Steel Co.*, 523 U.S. at 89 ("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction."). The "courts' statutory or constitutional *power* to adjudicate the case" is "not defeated by the possibility that the averments [in the complaint] might fail to state a cause of action on which petitioners could actually recover." *Id.* (cleaned up). If the complaint places the dispute within the "authority granted to [the court] by the Constitution and laws of the sovereignty," *Henderson County,* 216 N.C. at 423, that court has "jurisdiction to decide whether the allegations state a cause of action on which [it] can grant relief as well as to determine issues of fact arising in the controversy," *Bell*, 327 U.S. at 682.

By those lights, administrative exhaustion does not imbue or divest a court

with jurisdiction over *Corum* claims. The availability of agency relief goes to an element of a plaintiff's cause of action—i.e., whether *Corum* offers a direct constitutional claim because existing relief falls short. *Corum*, 330 N.C. at 782. That a court may hear the case does not, of course, mean the plaintiff will "win other pretrial motions, defeat affirmative defenses, or ultimately succeed on the merits of his case." *Craig*, 363 N.C. at 340. But those eventualities turn on the merits of the claim, not the courts' power to hear it at all. For that reason, *Corum* does not shut the courthouse doors merely because a plaintiff did not deplete administrative relief.

### 3. *Remedial Adequacy and Administrative Exhaustion*

The question instead is whether the administrative process is an adequate proxy for a direct constitutional suit. *Cf. Lloyd v. Babb*, 296 N.C. 416, 428 (1979) ("[W]hen an *effective* administrative remedy exists, that remedy is exclusive."). Courts must examine the interplay between the specific administrative regime, the asserted constitutional right, and "the wrongs of which [a plaintiff] complain[s]." *See id.* In general terms, an administrative process is adequate if it allows the plaintiff to enter the courthouse doors, meaningfully air their constitutional claim, and if successful, secure substantive redress for their injuries. *See Craig*, 363 N.C. 339–40 ("[T]o be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim."); *see also id.* at 340 ("[A]n adequate remedy must provide the possibility of relief under the circumstances."). We decline to set a checklist, as each case will turn on the fit

between the administrative scheme, the asserted constitutional violation, and the facts alleged. In substance, though, an adequate administrative remedy must offer a fair "turn at bat"—it may not doom *Corum* claims to echo into a bureaucratic void. *See Goldston v. State*, 361 N.C. 26, 35 (2006) (cleaned up); *cf. Charlotte-Mecklenburg Hosp. Auth. v. N.C. Indus. Comm'n*, 336 N.C. 200, 209–10 (1993) (finding administrative remedy inadequate because plaintiffs challenged the facial validity of agency rule and the statute only allowed review of individual disputes and awards on "*specific claims* for compensation").

This Court has followed that case-by-case approach. In *Deminski*, for instance, the plaintiff—a mother of public school students—brought *Corum* claims against a school board for its deliberate indifference to harassment in the classroom. *See Deminski*, 377 N.C. at 407. The board urged us to withhold *Corum* relief because the plaintiff enjoyed an adequate administrative remedy under N.C.G.S. § 115C-45. According to the board, that statute provided a right to appeal a final administrative decision of a school employee—first to the local school board and then to superior court. Since the plaintiff could eventually challenge the school's inaction or violation of state law, the board argued, the administrative process was good enough to bar her *Corum* suit.

We disagreed, holding that the plaintiff "alleged a colorable constitutional claim for which no other adequate state law remedy exists." *Id.* at 415. Necessarily, then, we rejected the adequacy of the administrative remedy and excused the plaintiff

from exhausting it. *See id.* Our opinion acknowledged that the administrative process could protract the ongoing harassment. *See id.* at 409. We noted, for instance, that the plaintiff and her children repeatedly alerted the school of the bullying. *Id.* In response, school personnel alluded to the administrative protocol in place, "insist[ing] that there was a process that would take time." *Id.* (cleaned up). But despite those assurances, "the bullying and harassment continued with no real change." *Id.*

When the plaintiff sued, she alleged that the school—and thus the board— failed "to take adequate action to address" known harassment in the classroom. *Id.* at 414. Given the nature of the claim and the board's history of inaction, forcing the plaintiff to deplete essentially irrelevant administrative remedies would prolong the cycle of deliberate indifference she sought to end. Reasoning that the constitutional violation "cannot be redressed through other means," we allowed the plaintiff to seek *Corum* relief. *Id.* at 415.

In other cases, too, we have allowed *Corum* claims that assert constitutional harm in the administrative process itself. *See Tully*, 370 N.C. at 536 (allowing *Corum* claim under Article I, Section I when the plaintiff's government employer "arbitrarily and capriciously denied him the ability to appeal an aspect of the promotional process" by ignoring its own policies and "summarily denying his grievance petition without any reason or rationale other than that the examination answers were not a grievable item" (cleaned up)). That approach is not an outlier. The Supreme Court of the United States, for instance, has allowed parties to bypass the usual

administrative course when raising "structural constitutional claims," *see Axon*, 143 S. Ct. at 904, that allege harm in "being subjected to unconstitutional agency authority," *see id.* at 903 (cleaned up). If a plaintiff challenges their "subjection to an illegitimate" administrative process "irrespective of its outcome," the Court explained, they "will lose their rights not to undergo the complained-of agency proceedings if they cannot assert those rights until the proceedings are over." *Id.* at 903–04.

That precedent imparts a clear lesson: conditioning *Corum* claims on administrative exhaustion would ignore the special status of constitutional rights and the courts' special role in protecting them from state encroachment. In some cases, a particular agency process may allow meaningful ventilation of a particular constitutional claim on particular facts. *See, e.g.*, *Copper*, 363 N.C. at 788–89. In others, administrative channels may prove unavailing. *See, e.g., Deminski*, 377 N.C. at 414. But the adequacy of administrative relief is, at bottom, a flexible inquiry that a court must weigh. *See, e.g., Craig*, 363 N.C. at 342 (affirming the denial of summary judgment award and allowing *Corum* claim to proceed because plaintiff lacked an adequate remedy); *see also Washington*, 898 S.E.2d at 673 (affirming entry of summary judgment against *Corum* claimant because an existing statutory remedy provided adequate relief for speedy trial violation). Flatly tying administrative exhaustion to jurisdiction is inappropriate for *Corum* claims and the constitutional rights under their aegis.

## C. Application

So examined, the Court of Appeals' errors are clear. It merged plaintiffs' separate claims under the Law of the Land Clause, treating their substantive due process and equal protection challenges as one and the same. The court's analysis thus overlooked the distinct constitutional injuries and theories of recovery raised by plaintiffs' separate *Corum* claims. That distinction (or lack thereof) matters. According to plaintiffs, *Corum* relief is needed precisely because the administrative process cannot meaningfully redress their discrete constitutional harms.

The Court of Appeals did not grapple with plaintiffs' adequacy arguments, much less the City's responses. Instead, it imported the administrative exhaustion requirement into *Corum*'s unique realm. Building on its first analytical shortfall, the court surmised that the crux of plaintiffs' constitutional claims—the unjustified condemnation of their properties—could be reviewed and redressed through the administrative process. *Askew*, 287 N.C. App. at 229. For that reason, it held that plaintiffs' failure to exhaust extinguished the trial court's subject-matter jurisdiction. *Id.* at 230. That was error, as explained above. On remand, the Court of Appeals must revisit the administrative scheme and reevaluate its congruence with plaintiffs' discrete *Corum* claims.

## III.    Conclusion

The trial court granted summary judgment to Kinston on all claims against it. But because the Court of Appeals resolved the case on jurisdictional grounds, it

vacated the trial court's ruling without reaching its substance. We vacate the Court of Appeals decision and remand to that court to conduct a standard de novo review of the merits of the trial court's summary judgment order. *See Est. of Graham v. Lambert*, 385 N.C. 644, 650 (2024).

Because plaintiffs are the nonmovants, the Court of Appeals must view the evidence in their favor and ask whether "there is any genuine issue as to any material fact, and whether any party is entitled to a judgment as a matter of law." *See Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 535 (1971). The trial court did not specify its rationale for granting summary judgment. On remand, then, the Court of Appeals should first ask whether the administrative process provides an adequate state law remedy for plaintiffs' discrete constitutional challenges. After disaggregating plaintiffs' *Corum* suits, the court should affirm the summary judgment order if there is no genuine factual question that the administrative process "meaningfully addresses the constitutional violation." *See Washington*, 898 S.E.2d at 671. If "established claims or remedies" are inadequate for plaintiffs' equal protection or substantive due process challenges, *see Corum*, 330 N.C. at 784, the Court of Appeals should then examine whether a genuine factual dispute exists on the merits of the surviving *Corum* claims.

VACATED AND REMANDED.